# BOB JONES UNIVERSITY *v.* UNITED STATES

No. 81–3.   Argued October 12, 1982—Decided May 24, 1983*

---

*Together with No. 81–1, *Goldsboro Christian Schools, Inc.* v. *United States,* also on certiorari to the same court.

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined, and in Part III of which POWELL, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 606. REHNQUIST, J., filed a dissenting opinion, *post*, p. 612.

*William G. McNairy* argued the cause for petitioner in No. 81–1. With him on the briefs were *Claude C. Pierce, Edward C. Winslow,* and *John H. Small. William Bentley Ball* argued the cause for petitioner in No. 81–3. With him on the briefs were *Philip J. Murren* and *Richard E. Connell.*

*Assistant Attorney General Reynolds* argued the cause for the United States in both cases. With him on the briefs were *Acting Solicitor General Wallace* and *Deputy Assistant Attorney General Cooper.*

*William T. Coleman, Jr., pro se,* by invitation of the Court, 456 U. S. 922, argued the cause as *amicus curiae* urging affirmance. With him on the brief were *Richard C. Warmer, Donald T. Bliss, John W. Stamper, Ira M. Feinberg,* and *Eric Schnapper.*†

---

†Briefs of *amici curiae* urging reversal in No. 81–3 were filed by *Earl W. Trent, Jr.,* and *John W. Baker* for the American Baptist Churches in the U. S. A. et al.; by *William H. Ellis* for the Center for Law and Religious Freedom of the Christian Legal Society; by *Forest D. Montgomery* for the National Association of Evangelicals; and by *Congressman Trent Lott, pro se.*

Briefs of *amici curiae* urging affirmance in both cases were filed by *Nadine Strossen, E. Richard Larson,* and *Samuel Rabinove* for the American Civil Liberties Union et al.; by *Harold P. Weinberger, Lawrence S. Robbins, Justin J. Finger, Jeffrey P. Sinensky,* and *David M. Raim* for the Anti-Defamation League of B'nai B'rith; by *John H. Pickering, William T. Lake,* and *Adam Yarmolinsky* for Independent Sector; by *Amy Young-Anawaty, David Carliner, Burt Neuborne,* and *Harry A. Inman* for the International Human Rights Law Group; by *Robert H. Kapp, Walter A. Smith, Jr., Joseph M. Hassett, David S. Tatel, Richard C. Dinkelspiel, William L. Robinson, Norman J. Chachkin,* and *Frank R. Parker* for the Lawyers' Committee for Civil Rights Under Law; by *Thomas I. Atkins,*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether petitioners, nonprofit private schools that prescribe and enforce racially discriminatory admissions standards on the basis of religious doctrine, qualify as tax-exempt organizations under § 501(c)(3) of the Internal Revenue Code of 1954.

## I

## A

Until 1970, the Internal Revenue Service granted tax-exempt status to private schools, without regard to their racial admissions policies, under § 501(c)(3) of the Internal Revenue Code, 26 U. S. C. § 501(c)(3),[1] and granted chari-

_J. Harold Flannery_, and _Robert D. Goldstein_ for the National Association for the Advancement of Colored People et al.; by _Leon Silverman, Linda R. Blumkin, Ann F. Thomas, Marla G. Simpson_, and _Jack Greenberg_ for the NAACP Legal Defense and Educational Fund, Inc.; by _Harry K. Mansfield_ for the National Association of Independent Schools; by _Charles E. Daye_ for the North Carolina Association of Black Lawyers; by _Earle K. Moore_ for the United Church of Christ; and by _Lawrence E. Lewy, pro se._

Briefs of _amici curiae_ in both cases were filed by _Martin B. Cowan_ and _Dennis Rapps_ for the National Jewish Commission on Law and Public Affairs; and by _Laurence H. Tribe, pro se,_ and _Bernard Wolfman, pro se._

[1] Section 501(c)(3) lists the following organizations, which, pursuant to § 501(a), are exempt from taxation unless denied tax exemptions under other specified sections of the Code:

"Corporations, and any community chest, fund, or foundation, _organized and operated exclusively for religious, charitable_, scientific, testing for public safety, literary, _or educational purposes_, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation . . . , and which does not participate in, or intervene in (including the publishing or distributing of statements), any

table deductions for contributions to such schools under § 170 of the Code, 26 U. S. C. § 170.[2]

On January 12, 1970, a three-judge District Court for the District of Columbia issued a preliminary injunction prohibiting the IRS from according tax-exempt status to private schools in Mississippi that discriminated as to admissions on the basis of race. *Green* v. *Kennedy*, 309 F. Supp. 1127, appeal dism'd *sub nom. Cannon* v. *Green*, 398 U. S. 956 (1970). Thereafter, in July 1970, the IRS concluded that it could "no longer legally justify allowing tax-exempt status [under § 501(c)(3)] to private schools which practice racial discrimination." IRS News Release, July 7, 1970, reprinted in App. in No. 81–3, p. A235. At the same time, the IRS announced that it could not "treat gifts to such schools as charitable deductions for income tax purposes [under § 170]." *Ibid.* By letter dated November 30, 1970, the IRS formally notified private schools, including those involved in this litigation, of this change in policy, "applicable to all private schools in the United States at all levels of education." See *id.*, at A232.

On June 30, 1971, the three-judge District Court issued its opinion on the merits of the Mississippi challenge. *Green* v. *Connally*, 330 F. Supp. 1150, summarily aff'd *sub nom. Coit* v. *Green*, 404 U. S. 997 (1971). That court approved the IRS's amended construction of the Tax Code. The court also held that racially discriminatory private schools were not entitled to exemption under § 501(c)(3) and that donors were not entitled to deductions for contributions to such schools under § 170. The court permanently enjoined the Commissioner of

---

political campaign on behalf of any candidate for public office." (Emphasis added.)

[2] Section 170(a) allows deductions for certain "charitable contributions." Section 170(c)(2)(B) includes within the definition of "charitable contribution" a contribution or gift to or for the use of a corporation "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes . . . ."

Internal Revenue from approving tax-exempt status for any school in Mississippi that did not publicly maintain a policy of nondiscrimination.

The revised policy on discrimination was formalized in Revenue Ruling 71–447, 1971–2 Cum. Bull. 230:

> "Both the courts and the Internal Revenue Service have long recognized that the statutory requirement of being 'organized and operated exclusively for religious, charitable, . . . or educational purposes' was intended to express the basic common law concept [of 'charity']. . . . All charitable trusts, educational or otherwise, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy."

Based on the "national policy to discourage racial discrimination in education," the IRS ruled that "a [private] school not having a racially nondiscriminatory policy as to students is not 'charitable' within the common law concepts reflected in sections 170 and 501(c)(3) of the Code." *Id.*, at 231.[3]

The application of the IRS construction of these provisions to petitioners, two private schools with racially discriminatory admissions policies, is now before us.

## B

### *No. 81–3, Bob Jones University* v. *United States*

Bob Jones University is a nonprofit corporation located in Greenville, S. C.[4] Its purpose is "to conduct an institution

---

[3] Revenue Ruling 71–447, 1971–2 Cum. Bull. 230, defined "racially nondiscriminatory policy as to students" as meaning that

"the school admits the students of any race to all the rights, privileges, programs, and activities generally accorded or made available to students at that school and that the school does not discriminate on the basis of race in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs."

[4] Bob Jones University was founded in Florida in 1927. It moved to Greenville, S. C., in 1940, and has been incorporated as an eleemosynary institution in South Carolina since 1952.

of learning . . . , giving special emphasis to the Christian religion and the ethics revealed in the Holy Scriptures." Certificate of Incorporation, Bob Jones University, Inc., of Greenville, S. C., reprinted in App. in No. 81–3, p. A119. The corporation operates a school with an enrollment of approximately 5,000 students, from kindergarten through college and graduate school. Bob Jones University is not affiliated with any religious denomination, but is dedicated to the teaching and propagation of its fundamentalist Christian religious beliefs. It is both a religious and educational institution. Its teachers are required to be devout Christians, and all courses at the University are taught according to the Bible. Entering students are screened as to their religious beliefs, and their public and private conduct is strictly regulated by standards promulgated by University authorities.

The sponsors of the University genuinely believe that the Bible forbids interracial dating and marriage. To effectuate these views, Negroes were completely excluded until 1971. From 1971 to May 1975, the University accepted no applications from unmarried Negroes,[5] but did accept applications from Negroes married within their race.

Following the decision of the United States Court of Appeals for the Fourth Circuit in *McCrary* v. *Runyon*, 515 F. 2d 1082 (1975), aff'd, 427 U. S. 160 (1976), prohibiting racial exclusion from private schools, the University revised its policy. Since May 29, 1975, the University has permitted unmarried Negroes to enroll; but a disciplinary rule prohibits interracial dating and marriage. That rule reads:

> *"There is to be no interracial dating.*
>
> "1. Students who are partners in an interracial marriage will be expelled.

---

[5] Beginning in 1973, Bob Jones University instituted an exception to this rule, allowing applications from unmarried Negroes who had been members of the University staff for four years or more.

"2. Students who are members of or affiliated with any group or organization which holds as one of its goals or advocates interracial marriage will be expelled.

"3. Students who date outside of their own race will be expelled.

"4. Students who espouse, promote, or encourage others to violate the University's dating rules and regulations will be expelled." App. in No. 81–3, p. A197.

The University continues to deny admission to applicants engaged in an interracial marriage or known to advocate interracial marriage or dating. *Id.*, at A277.

Until 1970, the IRS extended tax-exempt status to Bob Jones University under § 501(c)(3). By the letter of November 30, 1970, that followed the injunction issued in *Green* v. *Kennedy*, 309 F. Supp. 1127 (DC 1970), the IRS formally notified the University of the change in IRS policy, and announced its intention to challenge the tax-exempt status of private schools practicing racial discrimination in their admissions policies.

After failing to obtain an assurance of tax exemption through administrative means, the University instituted an action in 1971 seeking to enjoin the IRS from revoking the school's tax-exempt status. That suit culminated in *Bob Jones University* v. *Simon*, 416 U. S. 725 (1974), in which this Court held that the Anti-Injunction Act of the Internal Revenue Code, 26 U. S. C. § 7421(a), prohibited the University from obtaining judicial review by way of injunctive action before the assessment or collection of any tax.

Thereafter, on April 16, 1975, the IRS notified the University of the proposed revocation of its tax-exempt status. On January 19, 1976, the IRS officially revoked the University's tax-exempt status, effective as of December 1, 1970, the day after the University was formally notified of the change in IRS policy. The University subsequently filed returns under the Federal Unemployment Tax Act for the period from December 1, 1970, to December 31, 1975, and paid a tax

totalling $21 on one employee for the calendar year of 1975. After its request for a refund was denied, the University instituted the present action, seeking to recover the $21 it had paid to the IRS. The Government counterclaimed for unpaid federal unemployment taxes for the taxable years 1971 through 1975, in the amount of $489,675.59, plus interest.

The United States District Court for the District of South Carolina held that revocation of the University's tax-exempt status exceeded the delegated powers of the IRS, was improper under the IRS rulings and procedures, and violated the University's rights under the Religion Clauses of the First Amendment. 468 F. Supp. 890, 907 (1978). The court accordingly ordered the IRS to pay the University the $21 refund it claimed and rejected the IRS's counterclaim.

The Court of Appeals for the Fourth Circuit, in a divided opinion, reversed. 639 F. 2d 147 (1980). Citing *Green* v. *Connally*, 330 F. Supp. 1150 (DC 1971), with approval, the Court of Appeals concluded that § 501(c)(3) must be read against the background of charitable trust law. To be eligible for an exemption under that section, an institution must be "charitable" in the common-law sense, and therefore must not be contrary to public policy. In the court's view, Bob Jones University did not meet this requirement, since its "racial policies violated the clearly defined public policy, rooted in our Constitution, condemning racial discrimination and, more specifically, the government policy against subsidizing racial discrimination in education, public or private." 639 F. 2d, at 151. The court held that the IRS acted within its statutory authority in revoking the University's tax-exempt status. Finally, the Court of Appeals rejected petitioner's arguments that the revocation of the tax exemption violated the Free Exercise and Establishment Clauses of the First Amendment. The case was remanded to the District Court with instructions to dismiss the University's claim for a refund and to reinstate the IRS's counterclaim.

C

*No. 81–1, Goldsboro Christian Schools, Inc. v. United States*

Goldsboro Christian Schools is a nonprofit corporation located in Goldsboro, N. C. Like Bob Jones University, it was established "to conduct an institution or institutions of learning . . . , giving special emphasis to the Christian religion and the ethics revealed in the Holy scriptures." Articles of Incorporation ¶ 3(a); see Complaint ¶ 6, reprinted in App. in No. 81–1, pp. 5–6. The school offers classes from kindergarten through high school, and since at least 1969 has satisfied the State of North Carolina's requirements for secular education in private schools. The school requires its high school students to take Bible-related courses, and begins each class with prayer.

Since its incorporation in 1963, Goldsboro Christian Schools has maintained a racially discriminatory admissions policy based upon its interpretation of the Bible.[6] Goldsboro has for the most part accepted only Caucasians. On occasion, however, the school has accepted children from racially mixed marriages in which one of the parents is Caucasian.

Goldsboro never received a determination by the IRS that it was an organization entitled to tax exemption under § 501(c)(3). Upon audit of Goldsboro's records for the years 1969 through 1972, the IRS determined that Goldsboro was not an organization described in § 501(c)(3), and therefore was required to pay taxes under the Federal Insurance Contribution Act and the Federal Unemployment Tax Act.

---

[6] According to the interpretation espoused by Goldsboro, race is determined by descendance from one of Noah's three sons—Ham, Shem, and Japheth. Based on this interpretation, Orientals and Negroes are Hamitic, Hebrews are Shemitic, and Caucasians are Japhethitic. Cultural or biological mixing of the races is regarded as a violation of God's command. App. in No. 81–1, pp. 40–41.

Goldsboro paid the IRS $3,459.93 in withholding, social security, and unemployment taxes with respect to one employee for the years 1969 through 1972. Thereafter, Goldsboro filed a suit seeking refund of that payment, claiming that the school had been improperly denied § 501(c)(3) exempt status.[7] The IRS counterclaimed for $160,073.96 in unpaid social security and unemployment taxes for the years 1969 through 1972, including interest and penalties.[8]

The District Court for the Eastern District of North Carolina decided the action on cross-motions for summary judgment. 436 F. Supp. 1314 (1977). In addressing the motions for summary judgment, the court assumed that Goldsboro's racially discriminatory admissions policy was based upon a sincerely held religious belief. The court nevertheless rejected Goldsboro's claim to tax-exempt status under § 501(c)(3), finding that "private schools maintaining racially discriminatory admissions policies violate clearly declared federal policy and, therefore, must be denied the federal tax benefits flowing from qualification under Section 501(c)(3)." *Id.*, at 1318. The court also rejected Goldsboro's arguments that denial of tax-exempt status violated the Free Exercise and Establishment Clauses of the First Amendment. Accordingly, the court entered summary judgment for the IRS on its counterclaim.

The Court of Appeals for the Fourth Circuit affirmed, 644 F. 2d 879 (1981) *(per curiam)*. That court found an "identity for present purposes" between the *Goldsboro* case and the *Bob Jones University* case, which had been decided shortly

---

[7] Goldsboro also asserted that it was not obliged to pay taxes on lodging furnished to its teachers. It does not ask this Court to review the rejection of that claim.

[8] By stipulation, the IRS agreed to abate its assessment for 1969 and most of 1970 to reflect the fact that the IRS did not begin enforcing its policy of denying tax-exempt status to racially discriminatory private schools until November 30, 1970. As a result, the amount of the counterclaim was reduced to $116,190.99. *Id.*, at 104, 110.

before by another panel of that court, and affirmed for the reasons set forth in *Bob Jones University*.

We granted certiorari in both cases, 454 U. S. 892 (1981),[9] and we affirm in each.

## II

### A

In Revenue Ruling 71–447, the IRS formalized the policy, first announced in 1970, that § 170 and § 501(c)(3) embrace the common-law "charity" concept. Under that view, to qualify for a tax exemption pursuant to § 501(c)(3), an institution must show, first, that it falls within one of the eight categories expressly set forth in that section, and second, that its activity is not contrary to settled public policy.

Section 501(c)(3) provides that "[c]orporations . . . organized and operated exclusively for religious, charitable . . . or educational purposes" are entitled to tax exemption. Petitioners argue that the plain language of the statute guarantees them tax-exempt status. They emphasize the absence of any language in the statute expressly requiring all exempt organizations to be "charitable" in the common-law sense, and they contend that the disjunctive "or" separating the categories in § 501(c)(3) precludes such a reading. Instead, they argue that if an institution falls within one or more of

---

[9] After the Court granted certiorari, the Government filed a motion to dismiss, informing the Court that the Department of the Treasury intended to revoke Revenue Ruling 71–447 and other pertinent rulings and to recognize § 501(c)(3) exemptions for petitioners. The Government suggested that these actions were therefore moot. Before this Court ruled on that motion, however, the United States Court of Appeals for the District of Columbia Circuit enjoined the Government from granting § 501(c)(3) tax-exempt status to any school that discriminates on the basis of race. *Wright* v. *Regan*, No. 80–1124 (Feb. 18, 1982) (*per curiam* order). Thereafter, the Government informed the Court that it would not revoke the Revenue Rulings and withdrew its request that the actions be dismissed as moot. The Government continues to assert that the IRS lacked authority to promulgate Revenue Ruling 71–447, and does not defend that aspect of the rulings below.

the specified categories it is automatically entitled to exemption, without regard to whether it also qualifies as "charitable." The Court of Appeals rejected that contention and concluded that petitioners' interpretation of the statute "tears section 501(c)(3) from its roots." 639 F. 2d, at 151.

It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute:

> "The general words used in the clause . . . , taken by themselves, and literally construed, without regard to the object in view, would seem to sanction the claim of the plaintiff. But this mode of expounding a statute has never been adopted by any enlightened tribunal— because it is evident that in many cases it would defeat the object which the Legislature intended to accomplish. And it is well settled that, in interpreting a statute, the court will not look merely to a particular clause in which general words may be used, *but will take in connection with it the whole statute . . . and the objects and policy of the law. . . ."* Brown v. Duchesne, 19 How. 183, 194 (1857) (emphasis added).

Section 501(c)(3) therefore must be analyzed and construed within the framework of the Internal Revenue Code and against the background of the congressional purposes. Such an examination reveals unmistakable evidence that, underlying all relevant parts of the Code, is the intent that entitlement to tax exemption depends on meeting certain common-law standards of charity—namely, that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy.

This "charitable" concept appears explicitly in § 170 of the Code. That section contains a list of organizations virtually identical to that contained in § 501(c)(3). It is apparent that Congress intended that list to have the same meaning in both

sections.[10] In § 170, Congress used the list of organizations in defining the term "charitable contributions." On its face, therefore, § 170 reveals that Congress' intention was to provide tax benefits to organizations serving charitable purposes.[11] The form of § 170 simply makes plain what common sense and history tell us: in enacting both § 170 and

[10] The predecessor of § 170 originally was enacted in 1917, as part of the War Revenue Act of 1917, ch. 63, § 1201(2), 40 Stat. 330, whereas the predecessor of § 501(c)(3) dates back to the income tax law of 1894, Act of Aug. 27, 1894, ch. 349, 28 Stat. 509, see n. 14, *infra.* There are minor differences between the lists of organizations in the two sections, see generally Liles & Blum, Development of the Federal Tax Treatment of.Charities, 39 Law & Contemp. Prob. 6, 24–25 (No. 4, 1975) (hereinafter Liles & Blum). Nevertheless, the two sections are closely related; both seek to achieve the same basic goal of encouraging the development of certain organizations through the grant of tax benefits. The language of the two sections is in most respects identical, and the Commissioner and the courts consistently have applied many of the same standards in interpreting those sections. See 5 J. Mertens, Law of Federal Income Taxation § 31.12 (1980); 6 *id.*, §§ 34.01–34.13 (1975); B. Bittker & L. Stone, Federal Income Taxation 220–222 (5th ed. 1980). To the extent that § 170 "aids in ascertaining the meaning" of § 501(c)(3), therefore, it is "entitled to great weight," *United States* v. *Stewart*, 311 U. S. 60, 64–65 (1940). See *Harris* v. *Commissioner*, 340 U. S. 106, 107 (1950).

[11] The dissent suggests that the Court "quite adeptly avoids the statute it is construing," *post,* at 612, and "seeks refuge . . . by turning to § 170," *post,* at 613. This assertion dissolves when one sees that § 501(c)(3) and § 170 are construed together, as they must be. The dissent acknowledges that the two sections are "mirror" provisions; surely there can be no doubt that the Court properly looks to § 170 to determine the meaning of § 501(c)(3). It is also suggested that § 170 is "at best of little usefulness in finding the meaning of § 501(c)(3)," since "§ 170(c) simply tracks the requirements set forth in § 501(c)(3)," *post,* at 614. That reading loses sight of the fact that § 170(c) defines the term "charitable contribution." The plain language of § 170 reveals that Congress' objective was to employ tax exemptions and deductions to promote certain *charitable* purposes. While the eight categories of institutions specified in the statute are indeed presumptively charitable in nature, the IRS properly considered principles of charitable trust law in determining whether the institutions in question may truly be considered "charitable" for purposes of entitlement to the tax benefits conferred by § 170 and § 501(c)(3).

§ 501(c)(3), Congress sought to provide tax benefits to charitable organizations, to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind.

Tax exemptions for certain institutions thought beneficial to the social order of the country as a whole, or to a particular community, are deeply rooted in our history, as in that of England. The origins of such exemptions lie in the special privileges that have long been extended to charitable trusts.[12]

More than a century ago, this Court announced the caveat that is critical in this case:

> "[I]t has now become an established principle of American law, that courts of chancery will sustain and protect . . . a gift . . . to public charitable uses, *provided the same is consistent with local laws and public policy. . . .*" *Perin* v. *Carey*, 24 How. 465, 501 (1861) (emphasis added).

Soon after that, in 1877, the Court commented:

> "A charitable use, *where neither law nor public policy forbids*, may be applied to almost any thing *that tends to promote the well-doing and well-being of social man.*" *Ould* v. *Washington Hospital for Foundlings*, 95 U. S. 303, 311 (emphasis added).

---

[12] The form and history of the charitable exemption and deduction sections of the various income tax Acts reveal that Congress was guided by the common law of charitable trusts. See Simon, The Tax-Exempt Status of Racially Discriminatory Religious Schools, 36 Tax L. Rev. 477, 485–489 (1981) (hereinafter Simon). Congress acknowledged as much in 1969. The House Report on the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, stated that the § 501(c)(3) exemption was available only to institutions that served "the specified charitable purposes," H. R. Rep. No. 91–413, pt. 1, p. 35 (1969), and described "charitable" as "a term that has been used in the law of trusts for hundreds of years." *Id.*, at 43. We need not consider whether Congress intended to incorporate into the Internal Revenue Code any aspects of charitable trust law other than the requirements of public benefit and a valid public purpose.

See also, *e. g.*, *Jackson* v. *Phillips*, 96 Mass. 539, 556 (1867). In 1891, in a restatement of the English law of charity[13] which has long been recognized as a leading authority in this country, Lord MacNaghten stated:

> "'Charity' in its legal sense comprises four principal divisions: trusts for the relief of poverty; *trusts for the advancement of education;* trusts for the advancement of religion; and trusts for *other purposes beneficial to the community*, not falling under any of the preceding heads." *Commissioners* v. *Pemsel*, [1891] A. C. 531, 583 (emphasis added).

See, *e. g.*, 4 A. Scott, Law of Trusts § 368, pp. 2853–2854 (3d ed. 1967) (hereinafter Scott). These statements clearly reveal the legal background against which Congress enacted the first charitable exemption statute in 1894:[14] charities were to be given preferential treatment because they provide a benefit to society.

What little floor debate occurred on the charitable exemption provision of the 1894 Act and similar sections of later statutes leaves no doubt that Congress deemed the specified organizations entitled to tax benefits because they served desirable public purposes. See, *e. g.*, 26 Cong. Rec. 585–586

---

[13] The draftsmen of the 1894 income tax law, which included the first charitable exemption provision, relied heavily on English concepts of taxation; and the list of exempt organizations appears to have been patterned upon English income tax statutes. See 26 Cong. Rec. 584–588, 6612–6615 (1894).

[14] Act of Aug. 27, 1894, ch. 349, § 32, 28 Stat. 556–557. The income tax system contained in the 1894 Act was declared unconstitutional, *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601 (1895), for reasons unrelated to the charitable exemption provision. The terms of that exemption were in substance included in the corporate income tax contained in the Payne-Aldrich Tariff Act of 1909, ch. 6, § 38, 36 Stat. 112. A similar exemption has been included in every income tax Act since the adoption of the Sixteenth Amendment, beginning with the Revenue Act of 1913, ch. 16, § II(G), 38 Stat. 172. See generally Reiling, Federal Taxation: What Is a Charitable Organization?, 44 A. B. A. J. 525 (1958); Liles & Blum.

(1894); *id.*, at 1727. In floor debate on a similar provision in 1917, for example, Senator Hollis articulated the rationale:

"For every dollar that a man contributes for these public charities, educational, scientific, or otherwise, the public gets 100 per cent." 55 Cong. Rec. 6728.

See also, *e. g.*, 44 Cong. Rec. 4150 (1909); 50 Cong. Rec. 1305–1306 (1913). In 1924, this Court restated the common understanding of the charitable exemption provision:

"Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain." *Trinidad* v. *Sagrada Orden*, 263 U. S. 578, 581.[15]

In enacting the Revenue Act of 1938, ch. 289, 52 Stat. 447, Congress expressly reconfirmed this view with respect to the charitable deduction provision:

"The exemption from taxation of money or property devoted to charitable and other purposes is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from other public funds, and by the benefits resulting from the promotion of the general welfare." H. R. Rep. No. 1860, 75th Cong., 3d Sess., 19 (1938).[16]

---

[15] That same year, the Bureau of Internal Revenue expressed a similar view of the charitable deduction section of the estate tax contained in the Revenue Act of 1918, ch. 18, § 403(a)(3), 40 Stat. 1098. The Solicitor of Internal Revenue looked to the common law of charitable trusts in construing that provision, and noted that "generally bequests for the benefit and advantage of the general public are valid as charities." Sol. Op. 159, III–1 Cum. Bull. 480, 482 (1924).

[16] The common-law requirement of public benefit is universally recognized by commentators on the law of trusts. For example, the Bogerts state:

"In return for the favorable treatment accorded charitable gifts which imply some disadvantage to the community, the courts must find in the

A corollary to the public benefit principle is the requirement, long recognized in the law of trusts, that the purpose of a charitable trust may not be illegal or violate established public policy. In 1861, this Court stated that a public charitable use must be "consistent with local laws and public policy," *Perin* v. *Carey*, 24 How., at 501. Modern commentators and courts have echoed that view. See, *e. g.*, Restatement (Second) of Trusts § 377, Comment *c* (1959); 4 Scott § 377, and cases cited therein; Bogert § 378, at 191–192.[17]

When the Government grants exemptions or allows deductions all taxpayers are affected; the very fact of the exemption or deduction for the donor means that other taxpayers can be said to be indirect and vicarious "donors." Charitable exemptions are justified on the basis that the exempt entity confers a public benefit—a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues.[18] History but-

---

trust which is to be deemed 'charitable' some real advantages to the public which more than offset the disadvantages arising out of special privileges accorded charitable trusts." G. Bogert & G. Bogert, Law of Trusts and Trustees § 361, p. 3 (rev. 2d ed. 1977) (hereinafter Bogert).

For other statements of this principle, see, *e. g.*, 4 Scott § 348, at 2770; Restatement (Second) of Trusts § 368, Comment *b* (1959); E. Fisch, D. Freed, & E. Schachter, Charities and Charitable Foundations § 256 (1974).

[17] Cf. *Tank Truck Rentals, Inc.* v. *Commissioner*, 356 U. S. 30, 35 (1958), in which this Court referred to "the presumption against congressional intent to encourage violation of declared public policy" in upholding the Commissioner's disallowance of deductions claimed by a trucking company for fines it paid for violations of state maximum weight laws.

[18] The dissent acknowledges that "Congress intended . . . to offer a tax benefit to organizations . . . providing a public benefit," *post*, at 614–615, but suggests that Congress itself fully defined what organizations provide a public benefit, through the list of eight categories of exempt organizations contained in § 170 and § 501(c)(3). Under that view, any nonprofit organization that falls within one of the specified categories is automatically entitled to the tax benefits, provided it does not engage in expressly

tresses logic to make clear that, to warrant exemption under § 501(c)(3), an institution must fall within a category specified in that section and must demonstrably serve and be in harmony with the public interest.[19] The institution's purpose must not be so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred.

## B

We are bound to approach these questions with full awareness that determinations of public benefit and public policy are sensitive matters with serious implications for the institutions affected; a declaration that a given institution is not "charitable" should be made only where there can be no doubt that the activity involved is contrary to a fundamental public policy. But there can no longer be any doubt that racial discrimination in education violates deeply and widely accepted views of elementary justice. Prior to 1954, public education in many places still was conducted under the pall of

---

prohibited lobbying or political activities. *Post*, at 617. The dissent thus would have us conclude, for example, that any nonprofit organization that does not engage in prohibited lobbying activities is entitled to tax exemption as an "educational" institution if it is organized for the "'instruction or training of the individual for the purpose of improving or developing his capabilities,'" 26 CFR § 1.501(c)(3)–1(d)(3) (1982). See *post*, at 623. As Judge Leventhal noted in *Green* v. *Connally*, 330 F. Supp. 1150, 1160 (DC), summarily aff'd *sub nom. Coit* v. *Green*, 404 U. S. 997 (1971), Fagin's school for educating English boys in the art of picking pockets would be an "educational" institution under that definition. Similarly, a band of former military personnel might well set up a school for intensive training of subversives for guerrilla warfare and terrorism in other countries; in the abstract, that "school" would qualify as an "educational" institution. Surely Congress had no thought of affording such an unthinking, wooden meaning to § 170 and § 501(c)(3) as to provide tax benefits to "educational" organizations that do not serve a public, charitable purpose.

[19] The Court's reading of § 501(c)(3) does not render meaningless Congress' action in specifying the eight categories of presumptively exempt organizations, as petitioners suggest. See Brief for Petitioner in No. 81–1, pp. 18–24. To be entitled to tax-exempt status under § 501(c)(3), an organization must first fall within one of the categories specified by Congress, and in addition must serve a valid charitable purpose.

*Plessy* v. *Ferguson,* 163 U. S. 537 (1896); racial segregation in primary and secondary education prevailed in many parts of the country. See, *e. g.,* Segregation and the Fourteenth Amendment in the States (B. Reams & P. Wilson eds. 1975).[20] This Court's decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), signalled an end to that era. Over the past quarter of a century, every pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination in public education.

An unbroken line of cases following *Brown* v. *Board of Education* establishes beyond doubt this Court's view that racial discrimination in education violates a most fundamental national public policy, as well as rights of individuals.

> "The right of a student not to be segregated on racial grounds in schools . . . is indeed so fundamental and pervasive that it is embraced in the concept of due process of law." *Cooper* v. *Aaron,* 358 U. S. 1, 19 (1958).

In *Norwood* v. *Harrison,* 413 U. S. 455, 468–469 (1973), we dealt with a nonpublic institution:

> "[A] private school—even one that discriminates—fulfills an important educational function; *however, . . . [that] legitimate educational function cannot be isolated from*

---

[20] In 1894, when the first charitable exemption provision was enacted, racially segregated educational institutions would not have been regarded as against public policy. Yet contemporary standards must be considered in determining whether given activities provide a public benefit and are entitled to the charitable tax exemption. In *Walz* v. *Tax Comm'n,* 397 U. S. 664, 673 (1970), we observed:

"Qualification for tax exemption is not perpetual or immutable; some tax-exempt groups lose that status when their activities take them outside the classification and new entities can come into being and qualify for exemption."

Charitable trust law also makes clear that the definition of "charity" depends upon contemporary standards. See, *e. g.,* Restatement (Second) of Trusts § 374, Comment *a* (1959); Bogert § 369, at 65–67; 4 Scott § 368, at 2855–2856.

*discriminatory practices . . . . [D]iscriminatory treatment exerts a pervasive influence on the entire educational process.*" (Emphasis added.)

See also *Runyon* v. *McCrary*, 427 U. S. 160 (1976); *Griffin* v. *County School Board*, 377 U. S. 218 (1964).

Congress, in Titles IV and VI of the Civil Rights Act of 1964, Pub. L. 88–352, 78 Stat. 241, 42 U. S. C. §§ 2000c, 2000c–6, 2000d, clearly expressed its agreement that racial discrimination in education violates a fundamental public policy. Other sections of that Act, and numerous enactments since then, testify to the public policy against racial discrimination. See, *e. g.*, the Voting Rights Act of 1965, Pub. L. 89–110, 79 Stat. 437, 42 U. S. C. § 1973 *et seq.* (1976 ed. and Supp. V); Title VIII of the Civil Rights Act of 1968, Pub. L. 90–284, 82 Stat. 81, 42 U. S. C. § 3601 *et seq.* (1976 ed. and Supp. V); the Emergency School Aid Act of 1972, Pub. L. 92–318, 86 Stat. 354 (repealed effective Sept. 30, 1979; replaced by similar provisions in the Emergency School Aid Act of 1978, Pub. L. 95–561, 92 Stat. 2252, 20 U. S. C. §§ 3191–3207 (1976 ed., Supp. V)).

The Executive Branch has consistently placed its support behind eradication of racial discrimination. Several years before this Court's decision in *Brown* v. *Board of Education, supra,* President Truman issued Executive Orders prohibiting racial discrimination in federal employment decisions, Exec. Order No. 9980, 3 CFR 720 (1943–1948 Comp.), and in classifications for the Selective Service, Exec. Order No. 9988, 3 CFR 726, 729 (1943–1948 Comp.). In 1957, President Eisenhower employed military forces to ensure compliance with federal standards in school desegregation programs. Exec. Order No. 10730, 3 CFR 389 (1954–1958 Comp.). And in 1962, President Kennedy announced:

"[T]he granting of Federal assistance for . . . housing and related facilities from which Americans are excluded because of their race, color, creed, or national origin is unfair, unjust, and inconsistent with the public policy of

the United States as manifested in its Constitution and laws." Exec. Order No. 11063, 3 CFR 652 (1959–1963 Comp.).

These are but a few of numerous Executive Orders over the past three decades demonstrating the commitment of the Executive Branch to the fundamental policy of eliminating racial discrimination. See, *e. g.*, Exec. Order No. 11197, 3 CFR 278 (1964–1965 Comp.); Exec. Order No. 11478, 3 CFR 803 (1966–1970 Comp.); Exec. Order No. 11764, 3 CFR 849 (1971–1975 Comp.); Exec. Order No. 12250, 3 CFR 298 (1981).

Few social or political issues in our history have been more vigorously debated and more extensively ventilated than the issue of racial discrimination, particularly in education. Given the stress and anguish of the history of efforts to escape from the shackles of the "separate but equal" doctrine of *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), it cannot be said that educational institutions that, for whatever reasons, practice racial discrimination, are institutions exercising "beneficial and stabilizing influences in community life," *Walz* v. *Tax Comm'n*, 397 U. S. 664, 673 (1970), or should be encouraged by having all taxpayers share in their support by way of special tax status.

There can thus be no question that the interpretation of § 170 and § 501(c)(3) announced by the IRS in 1970 was correct. That it may be seen as belated does not undermine its soundness. It would be wholly incompatible with the concepts underlying tax exemption to grant the benefit of tax-exempt status to racially discriminatory educational entities, which "exer[t] a pervasive influence on the entire educational process." *Norwood* v. *Harrison, supra*, at 469. Whatever may be the rationale for such private schools' policies, and however sincere the rationale may be, racial discrimination in education is contrary to public policy. Racially discriminatory educational institutions cannot be viewed as conferring a public benefit within the "charitable" concept discussed ear-

lier, or within the congressional intent underlying § 170 and § 501(c)(3).[21]

## C

Petitioners contend that, regardless of whether the IRS properly concluded that racially discriminatory private schools violate public policy, only Congress can alter the scope of § 170 and § 501(c)(3). Petitioners accordingly argue that the IRS overstepped its lawful bounds in issuing its 1970 and 1971 rulings.

Yet ever since the inception of the Tax Code, Congress has seen fit to vest in those administering the tax laws very broad authority to interpret those laws. In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems. Indeed as early as 1918, Congress expressly authorized the Commissioner "to make all needful rules and regulations for the enforcement" of the tax laws. Revenue Act of 1918, ch. 18, § 1309, 40 Stat. 1143. The same provision, so essential to efficient and fair administration of the tax laws, has appeared in Tax Codes ever since, see 26 U. S. C. § 7805(a); and this Court has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code, see, *e. g.*, *Commissioner* v. *Portland Cement Co. of Utah*, 450 U. S. 156, 169 (1981); *United States* v. *Correll*, 389 U. S. 299, 306–307 (1967); *Boske* v. *Comingore*, 177 U. S. 459, 469–470 (1900).

Congress, the source of IRS authority, can modify IRS rulings it considers improper; and courts exercise review over IRS actions. In the first instance, however, the responsibil-

---

[21] In view of our conclusion that racially discriminatory private schools violate fundamental public policy and cannot be deemed to confer a benefit on the public, we need not decide whether an organization providing a public benefit and otherwise meeting the requirements of § 501(c)(3) could nevertheless be denied tax-exempt status if certain of its activities violated a law or public policy.

ity for construing the Code falls to the IRS. Since Congress cannot be expected to anticipate every conceivable problem that can arise or to carry out day-to-day oversight, it relies on the administrators and on the courts to implement the legislative will. Administrators, like judges, are under oath to do so.

In § 170 and § 501(c)(3), Congress has identified categories of traditionally exempt institutions and has specified certain additional requirements for tax exemption. Yet the need for continuing interpretation of those statutes is unavoidable. For more than 60 years, the IRS and its predecessors have constantly been called upon to interpret these and comparable provisions, and in doing so have referred consistently to principles of charitable trust law. In Treas. Regs. 45, Art. 517(1) (1921), for example, the IRS's predecessor denied charitable exemptions on the basis of proscribed political activity before the Congress itself added such conduct as a disqualifying element. In other instances, the IRS has denied charitable exemptions to otherwise qualified entities because they served too limited a class of people and thus did not provide a truly "public" benefit under the common-law test. See, e. g., *Crellin* v. *Commissioner*, 46 B. T. A. 1152, 1155–1156 (1942); *James Sprunt Benevolent Trust* v. *Commissioner*, 20 B. T. A. 19, 24–25 (1930). See also Treas. Reg. § 1.501(c)(3)–1(d)(1)(ii) (1959). Some years before the issuance of the rulings challenged in these cases, the IRS also ruled that contributions to community recreational facilities would not be deductible and that the facilities themselves would not be entitled to tax-exempt status, unless those facilities were open to all on a racially nondiscriminatory basis. See Rev. Rul. 67–325, 1967–2 Cum. Bull. 113. These rulings reflect the Commissioner's continuing duty to interpret and apply the Internal Revenue Code. See also *Textile Mills Securities Corp.* v. *Commissioner*, 314 U. S. 326, 337–338 (1941).

Guided, of course, by the Code, the IRS has the responsibility, in the first instance, to determine whether a particu-

lar entity is "charitable" for purposes of § 170 and § 501(c)(3).[22] This in turn may necessitate later determinations of whether given activities so violate public policy that the entities involved cannot be deemed to provide a public benefit worthy of "charitable" status. We emphasize, however, that these sensitive determinations should be made only where there is no doubt that the organization's activities violate fundamental public policy.

On the record before us, there can be no doubt as to the national policy. In 1970, when the IRS first issued the ruling challenged here, the position of all three branches of the Federal Government was unmistakably clear. The correctness of the Commissioner's conclusion that a racially discriminatory private school "is not 'charitable' within the common law concepts reflected in . . . the Code," Rev. Rul. 71–447, 1971–2 Cum. Bull., at 231, is wholly consistent with what Congress, the Executive, and the courts had repeatedly declared before 1970. Indeed, it would be anomalous for the Executive, Legislative, and Judicial Branches to reach conclusions that add up to a firm public policy on racial discrimination, and at the same time have the IRS blissfully ignore what all three branches of the Federal Government had declared.[23] Clearly an educational institution engaging in

[22] In the present case, the IRS issued its rulings denying exemptions to racially discriminatory schools only after a three-judge District Court had issued a preliminary injunction. See *supra*, at 578–579.

[23] JUSTICE POWELL misreads the Court's opinion when he suggests that the Court implies that "the Internal Revenue Service is invested with authority to decide which public policies are sufficiently 'fundamental' to require denial of tax exemptions," *post*, at 611. The Court's opinion does not warrant that interpretation. JUSTICE POWELL concedes that "if any national policy is sufficiently fundamental to constitute such an overriding limitation on the availability of tax-exempt status under § 501(c)(3), it is the policy against racial discrimination in education." *Post*, at 607. Since that policy is sufficiently clear to warrant JUSTICE POWELL's concession and for him to support our finding of longstanding congressional acquiescence, it should be apparent that his concerns about the Court's opinion are unfounded.

practices affirmatively at odds with this declared position of the whole Government cannot be seen as exercising a "beneficial and stabilizing influenc[e] in community life," *Walz* v. *Tax Comm'n*, 397 U. S., at 673, and is not "charitable," within the meaning of § 170 and § 501(c)(3). We therefore hold that the IRS did not exceed its authority when it announced its interpretation of § 170 and § 501(c)(3) in 1970 and 1971.[24]

## D

The actions of Congress since 1970 leave no doubt that the IRS reached the correct conclusion in exercising its authority. It is, of course, not unknown for independent agencies or the Executive Branch to misconstrue the intent of a statute; Congress can and often does correct such misconceptions, if the courts have not done so. Yet for a dozen years Congress has been made aware—acutely aware—of the IRS rulings of 1970 and 1971. As we noted earlier, few issues have been the subject of more vigorous and widespread debate and discussion in and out of Congress than those related to racial segregation in education. Sincere adherents advocating contrary views have ventilated the subject for well over three decades. Failure of Congress to modify the IRS rulings of 1970 and 1971, of which Congress was, by its own studies and by public discourse, constantly reminded, and Congress' awareness of the denial of tax-exempt status for racially discriminatory schools when enacting other and related legislation make out an unusually strong case of legislative acquiescence in and ratification by implication of the 1970 and 1971 rulings.

---

[24] Many of the *amici curiae*, including *amicus* William T. Coleman, Jr. (appointed by the Court), argue that denial of tax-exempt status to racially discriminatory schools is independently required by the equal protection component of the Fifth Amendment. In light of our resolution of this litigation, we do not reach that issue. See, *e. g.*, *United States* v. *Clark*, 445 U. S. 23, 27 (1980); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 504 (1979).

Ordinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation. See, e. g., *Aaron* v. *SEC*, 446 U. S. 680, 694, n. 11 (1980). We have observed that "unsuccessful attempts at legislation are not the best of guides to legislative intent," *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 382, n. 11 (1969). Here, however, we do not have an ordinary claim of legislative acquiescence. Only one month after the IRS announced its position in 1970, Congress held its first hearings on this precise issue. Equal Educational Opportunity: Hearings before the Senate Select Committee on Equal Educational Opportunity, 91st Cong., 2d Sess., 1991 (1970). Exhaustive hearings have been held on the issue at various times since then. These include hearings in February 1982, after we granted review in this case. Administration's Change in Federal Policy Regarding the Tax Status of Racially Discriminatory Private Schools: Hearing before the House Committee on Ways and Means, 97th Cong., 2d Sess. (1982).

Nonaction by Congress is not often a useful guide, but the nonaction here is significant. During the past 12 years there have been no fewer than 13 bills introduced to overturn the IRS interpretation of §501(c)(3).[25] Not one of these bills has emerged from any committee, although Congress has enacted numerous other amendments to §501 during this same period, including an amendment to §501(c)(3) itself. Tax Reform Act of 1976, Pub. L. 94–455, §1313(a), 90 Stat. 1730. It is hardly conceivable that Congress—and in this setting, any Member of Congress—was not abundantly

---

[25] H. R. 1096, 97th Cong., 1st Sess. (1981); H. R. 802, 97th Cong., 1st Sess. (1981); H. R. 498, 97th Cong., 1st Sess. (1981); H. R. 332, 97th Cong., 1st Sess. (1981); H. R. 95, 97th Cong., 1st Sess. (1981); S. 995, 96th Cong., 1st Sess. (1979); H. R. 1905, 96th Cong., 1st Sess. (1979); H. R. 96, 96th Cong., 1st Sess. (1979); H. R. 3225, 94th Cong., 1st Sess. (1975); H. R. 1394, 93d Cong., 1st Sess. (1973); H. R. 5350, 92d Cong., 1st Sess. (1971); H. R. 2352, 92d Cong., 1st Sess. (1971); H. R. 68, 92d Cong., 1st Sess. (1971).

aware of what was going on. In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bills proposed on this subject provides added support for concluding that Congress acquiesced in the IRS rulings of 1970 and 1971. See, *e. g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 379–382 (1982); *Haig* v. *Agee*, 453 U. S. 280, 300–301 (1981); *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 384–386 (1983); *United States* v. *Rutherford*, 442 U. S. 544, 554, n. 10 (1979).

The evidence of congressional approval of the policy embodied in Revenue Ruling 71–447 goes well beyond the failure of Congress to act on legislative proposals. Congress affirmatively manifested its acquiescence in the IRS policy when it enacted the present § 501(i) of the Code, Act of Oct. 20, 1976, Pub. L. 94–568, 90 Stat. 2697. That provision denies tax-exempt status to social clubs whose charters or policy statements provide for "discrimination against any person on the basis of race, color, or religion."[26] Both the House and Senate Committee Reports on that bill articulated the national policy against granting tax exemptions to racially discriminatory private clubs. S. Rep. No. 94–1318, p. 8 (1976); H. R. Rep. No. 94–1353, p. 8 (1976).

Even more significant is the fact that both Reports focus on this Court's affirmance of *Green* v. *Connally*, 330 F. Supp. 1150 (DC 1971), as having established that "discrimination on account of race is inconsistent with an *educational institution's* tax-exempt status." S. Rep. No. 94–1318, *supra*, at 7–8, and n. 5; H. R. Rep. No. 94–1353, *supra*, at 8, and n. 5 (emphasis added). These references in congressional Committee Reports on an enactment denying tax exemptions to racially discriminatory private social clubs cannot be read

---

[26] Prior to the introduction of this legislation, a three-judge District Court had held that segregated social clubs were entitled to tax exemptions. *McGlotten* v. *Connally*, 338 F. Supp. 448 (DC 1972). Section 501(i) was enacted primarily in response to that decision. See S. Rep. No. 94–1318, pp. 7–8 (1976); H. R. Rep. No. 94–1353, p. 8 (1976).

other than as indicating approval of the standards applied to racially discriminatory private schools by the IRS subsequent to 1970, and specifically of Revenue Ruling 71–447.[27]

## III

Petitioners contend that, even if the Commissioner's policy is valid as to nonreligious private schools, that policy cannot constitutionally be applied to schools that engage in racial discrimination on the basis of sincerely held religious beliefs.[28]

---

[27] Reliance is placed on scattered statements in floor debate by Congressmen critical of the IRS's adoption of Revenue Ruling 71–447. See, e. g., Brief for Petitioner in No. 81–1, pp. 27–28. Those views did not prevail. That several Congressmen, expressing their individual views, argued that the IRS had no authority to take the action in question, is hardly a balance for the overwhelming evidence of congressional awareness of and acquiescence in the IRS rulings of 1970 and 1971. Petitioners also argue that the Ashbrook and Dornan Amendments to the Treasury, Postal Service, and General Government Appropriations Act of 1980, Pub. L. 96–74, §§ 103, 614, 615, 93 Stat. 559, 562, 576–577, reflect congressional opposition to the IRS policy formalized in Revenue Ruling 71–447. Those amendments, however, are directly concerned only with limiting more aggressive enforcement procedures proposed by the IRS in 1978 and 1979 and preventing the adoption of more stringent substantive standards. The Ashbrook Amendment, § 103 of the Act, applies only to procedures, guidelines, or measures adopted after August 22, 1978, and thus in no way affects the status of Revenue Ruling 71–447. In fact, both Congressman Dornan and Congressman Ashbrook explicitly stated that their amendments would have no effect on prior IRS policy, including Revenue Ruling 71–447, see 125 Cong. Rec. 18815 (1979) (Cong. Dornan: "[M]y amendment will not affect existing IRS rules which IRS has used to revoke tax exemptions of white segregated academies under Revenue Ruling 71–447. . . ."); id., at 18446 (Cong. Ashbrook: "My amendment very clearly indicates on its face that all the regulations in existence as of August 22, 1978, would not be touched"). These amendments therefore do not indicate congressional rejection of Revenue Ruling 71–447 and the standards contained therein.

[28] The District Court found, on the basis of a full evidentiary record, that the challenged practices of petitioner Bob Jones University were based on a genuine belief that the Bible forbids interracial dating and marriage. 468 F. Supp., at 894. We assume, as did the District Court, that the same

As to such schools, it is argued that the IRS construction of § 170 and § 501(c)(3) violates their free exercise rights under the Religion Clauses of the First Amendment. This contention presents claims not heretofore considered by this Court in precisely this context.

This Court has long held the Free Exercise Clause of the First Amendment to be an absolute prohibition against governmental regulation of religious beliefs, *Wisconsin* v. *Yoder*, 406 U. S. 205, 219 (1972); *Sherbert* v. *Verner*, 374 U. S. 398, 402 (1963); *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940). As interpreted by this Court, moreover, the Free Exercise Clause provides substantial protection for lawful conduct grounded in religious belief, see *Wisconsin* v. *Yoder*, *supra*, at 220; *Thomas* v. *Review Board of Indiana Employment Security Div.*, 450 U. S. 707 (1981); *Sherbert* v. *Verner*, *supra*, at 402–403. However, "[n]ot all burdens on religion are unconstitutional. . . . The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *United States* v. *Lee*, 455 U. S. 252, 257–258 (1982). See, *e. g.*, *McDaniel* v. *Paty*, 435 U. S. 618, 628, and n. 8 (1978); *Wisconsin* v. *Yoder*, *supra*, at 215; *Gillette* v. *United States*, 401 U. S. 437 (1971).

On occasion this Court has found certain governmental interests so compelling as to allow even regulations prohibiting religiously based conduct. In *Prince* v. *Massachusetts*, 321 U. S. 158 (1944), for example, the Court held that neutrally cast child labor laws prohibiting sale of printed materials on public streets could be applied to prohibit children from dispensing religious literature. The Court found no constitutional infirmity in "excluding [Jehovah's Witness children] from doing there what no other children may do." *Id.*, at 171. See also *Reynolds* v. *United States*, 98 U. S. 145 (1879); *United States* v. *Lee, supra; Gillette* v. *United States*, *supra*. Denial of tax benefits will inevitably have a substan-

---

is true with respect to petitioner Goldsboro Christian Schools. See 436 F. Supp., at 1317.

tial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets.

The governmental interest at stake here is compelling. As discussed in Part II–B, *supra*, the Government has a fundamental, overriding interest in eradicating racial discrimination in education[29]—discrimination that prevailed, with official approval, for the first 165 years of this Nation's constitutional history. That governmental interest substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs. The interests asserted by petitioners cannot be accommodated with that compelling governmental interest, see *United States* v. *Lee, supra,* at 259–260; and no "less restrictive means," see *Thomas* v. *Review Board of Indiana Employment Security Div., supra,* at 718, are available to achieve the governmental interest.[30]

---

[29] We deal here only with religious *schools*—not with churches or other purely religious institutions; here, the governmental interest is in denying public support to racial discrimination in education. As noted earlier, racially discriminatory schools "exer[t] a pervasive influence on the entire educational process," outweighing any public benefit that they might otherwise provide, *Norwood* v. *Harrison,* 413 U. S. 455, 469 (1973). See generally Simon 495–496.

[30] Bob Jones University also contends that denial of tax exemption violates the Establishment Clause by preferring religions whose tenets do not require racial discrimination over those which believe racial intermixing is forbidden. It is well settled that neither a state nor the Federal Government may pass laws which "prefer one religion over another," *Everson* v. *Board of Education,* 330 U. S. 1, 15 (1947), but "[i]t is equally true" that a regulation does not violate the Establishment Clause merely because it "happens to coincide or harmonize with the tenets of some or all religions." *McGowan* v. *Maryland,* 366 U. S. 420, 442 (1961). See *Harris* v. *McRae,* 448 U. S. 297, 319–320 (1980). The IRS policy at issue here is founded on a "neutral, secular basis," *Gillette* v. *United States,* 401 U. S. 437, 452 (1971), and does not violate the Establishment Clause. See generally U. S. Comm'n on Civil Rights, Discriminatory Religious Schools and Tax Exempt Status 10–17 (1982). In addition, as the Court of Appeals noted, "the uniform application of the rule to all religiously operated schools

## IV

The remaining issue is whether the IRS properly applied its policy to these petitioners. Petitioner Goldsboro Christian Schools admits that it "maintain[s] racially discriminatory policies," Brief for Petitioner in No. 81–1, p. 10, but seeks to justify those policies on grounds we have fully discussed. The IRS properly denied tax-exempt status to Goldsboro Christian Schools.

Petitioner Bob Jones University, however, contends that it is not racially discriminatory. It emphasizes that it now allows all races to enroll, subject only to its restrictions on the conduct of all students, including its prohibitions of association between men and women of different races, and of interracial marriage.[31] Although a ban on intermarriage or interracial dating applies to all races, decisions of this Court firmly establish that discrimination on the basis of racial affiliation and association is a form of racial discrimination, see, e. g., *Loving* v. *Virginia*, 388 U. S. 1 (1967); *McLaughlin* v. *Florida*, 379 U. S. 184 (1964); *Tillman* v. *Wheaton-Haven Recreation Assn.*, 410 U. S. 431 (1973). We therefore find that the IRS properly applied Revenue Ruling 71–447 to Bob Jones University.[32]

The judgments of the Court of Appeals are, accordingly,

*Affirmed.*

---

*avoids* the necessity for a potentially entangling inquiry into whether a racially restrictive practice is the result of sincere religious belief." 639 F. 2d 147, 155 (CA4 1980) (emphasis in original). Cf. *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490 (1979). But see generally Note, 90 Yale L. J. 350 (1980).

[31] This argument would in any event apply only to the final eight months of the five tax years at issue in this case. Prior to May 1975, Bob Jones University's admissions policy was racially discriminatory on its face, since the University excluded unmarried Negro students while admitting unmarried Caucasians.

[32] Bob Jones University also argues that the IRS policy should not apply to it because it is entitled to exemption under § 501(c)(3) as a "religious" organization, rather than as an "educational" institution. The record in

JUSTICE POWELL, concurring in part and concurring in the judgment.

I join the Court's judgment, along with Part III of its opinion holding that the denial of tax exemptions to petitioners does not violate the First Amendment. I write separately because I am troubled by the broader implications of the Court's opinion with respect to the authority of the Internal Revenue Service (IRS) and its construction of §§ 170(c) and 501(c)(3) of the Internal Revenue Code.

## I

Federal taxes are not imposed on organizations "operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . ." 26 U. S. C. § 501(c)(3). The Code also permits a tax deduction for contributions made to these organizations. § 170(c). It is clear that petitioners, organizations incorporated for educational purposes, fall within the language of the statute. It also is clear that the language itself does not mandate refusal of tax-exempt status to any private school that maintains a racially discriminatory admissions policy. Accordingly, there is force in JUSTICE REHNQUIST's argument that §§ 170(c) and 501(c)(3) should be construed as setting forth the only criteria Congress has established for qualification as a tax-exempt organization. See post, at 612–615 (REHNQUIST, J., dissenting). Indeed, were we writing prior to the history detailed in the Court's opinion, this could well be the construction I would adopt. But there has been a decade of acceptance that is persuasive in the circumstances of these cases, and I conclude that there are now sufficient reasons for accepting the IRS's construction of the Code as proscribing

_____

this case leaves no doubt, however, that Bob Jones University is both an educational institution and a religious institution. As discussed previously, the IRS policy properly extends to all private schools, including religious schools. See n. 29, supra. The IRS policy thus was properly applied to Bob Jones University.

tax exemptions for schools that discriminate on the basis of race as a matter of policy.

I cannot say that this construction of the Code, adopted by the IRS in 1970 and upheld by the Court of Appeals below, is without logical support. The statutory terms are not self-defining, and it is plausible that in some instances an organization seeking a tax exemption might act in a manner so clearly contrary to the purposes of our laws that it could not be deemed to serve the enumerated statutory purposes.[1] And, as the Court notes, if any national policy is sufficiently fundamental to constitute such an overriding limitation on the availability of tax-exempt status under § 501(c)(3), it is the policy against racial discrimination in education. See *ante*, at 595–596. Finally, and of critical importance for me, the subsequent actions of Congress present "an unusually strong case of legislative acquiescence in and ratification by implication of the [IRS's] 1970 and 1971 rulings" with respect to racially discriminatory schools. *Ante*, at 599. In particular, Congress' enactment of § 501(i) in 1976 is strong evidence of agreement with these particular IRS rulings.[2]

---

[1] I note that the Court has construed other provisions of the Code as containing narrowly defined public-policy exceptions. See *Commissioner* v. *Tellier*, 383 U. S. 687, 693–694 (1966); *Tank Truck Rentals, Inc.* v. *Commissioner*, 356 U. S. 30, 35 (1958).

[2] The District Court for the District of Columbia in *Green* v. *Connally*, 330 F. Supp. 1150 (three-judge court), summarily aff'd *sub nom. Coit* v. *Green*, 404 U. S. 997 (1971), held that racially discriminatory private schools were not entitled to tax-exempt status. The same District Court, however, later ruled that racially segregated social clubs could receive tax exemptions under § 501(c)(7) of the Code. See *McGlotten* v. *Connally*, 338 F. Supp. 448 (1972) (three-judge court). Faced with these two important three-judge court rulings, Congress expressly overturned the relevant portion of *McGlotten* by enacting § 501(i), thus conforming the policy with respect to social clubs to the prevailing policy with respect to private schools. This affirmative step is a persuasive indication that Congress has not just silently acquiesced in the result of *Green*. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 402 (1982) (POWELL, J.,

## II

I therefore concur in the Court's judgment that tax-exempt status under §§ 170(c) and 501(c)(3) is not available to private schools that concededly are racially discriminatory. I do not agree, however, with the Court's more general explanation of the justifications for the tax exemptions provided to charitable organizations. The Court states:

> "Charitable exemptions are justified on the basis that the exempt entity confers a public benefit—a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues. History buttresses logic to make clear that, to warrant exemption under § 501(c)(3), an institution must fall within a category specified in that section and must demonstrably serve and be in harmony with the public interest. The institution's purpose must not be so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred." *Ante*, at 591–592 (footnotes omitted).

Applying this test to petitioners, the Court concludes that "[c]learly an educational institution engaging in practices affirmatively at odds with [the] declared position of the whole Government cannot be seen as exercising a 'beneficial and stabilizing influenc[e] in community life,' . . . and is not 'charitable,' within the meaning of § 170 and § 501(c)(3)." *Ante*, at 598–599 (quoting *Walz v. Tax Comm'n*, 397 U. S. 664, 673 (1970)).

With all respect, I am unconvinced that the critical question in determining tax-exempt status is whether an individual organization provides a clear "public benefit" as defined by the Court. Over 106,000 organizations filed § 501(c)(3) returns in 1981. Internal Revenue Service, 1982 Exempt

dissenting) (rejecting theory "that congressional intent can be inferred from silence, and that legislative inaction should achieve the force of law").

Organization/Business Master File. I find it impossible to believe that all or even most of those organizations could prove that they "demonstrably serve and [are] in harmony with the public interest" or that they are "beneficial and stabilizing influences in community life." Nor am I prepared to say that petitioners, because of their racially discriminatory policies, necessarily contribute nothing of benefit to the community. It is clear from the substantially secular character of the curricula and degrees offered that petitioners provide educational benefits.

Even more troubling to me is the element of conformity that appears to inform the Court's analysis. The Court asserts that an exempt organization must "demonstrably serve and be in harmony with the public interest," must have a purpose that comports with "the common community conscience," and must not act in a manner "affirmatively at odds with [the] declared position of the whole Government." Taken together, these passages suggest that the primary function of a tax-exempt organization is to act on behalf of the Government in carrying out governmentally approved policies. In my opinion, such a view of § 501(c)(3) ignores the important role played by tax exemptions in encouraging diverse, indeed often sharply conflicting, activities and viewpoints. As JUSTICE BRENNAN has observed, private, nonprofit groups receive tax exemptions because "each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society." *Walz*, *supra*, at 689 (concurring opinion). Far from representing an effort to reinforce any perceived "common community conscience," the provision of tax exemptions to nonprofit groups is one indispensable means of limiting the influence of governmental orthodoxy on important areas of community life.[3]

---

[3] Certainly § 501(c)(3) has not been applied in the manner suggested by the Court's analysis. The 1,100-page list of exempt organizations includes—among countless examples—such organizations as American Friends Service Committee, Inc., Committee on the Present Danger,

Given the importance of our tradition of pluralism,[4] "[t]he interest in preserving an area of untrammeled choice for private philanthropy is very great." *Jackson* v. *Statler Foundation*, 496 F. 2d 623, 639 (CA2 1974) (Friendly, J., dissenting from denial of reconsideration en banc).

I do not suggest that these considerations always are or should be dispositive. Congress, of course, may find that some organizations do not warrant tax-exempt status. In these cases I agree with the Court that Congress has determined that the policy against racial discrimination in education should override the countervailing interest in permitting unorthodox private behavior.

---

Jehovahs Witnesses in the United States, Moral Majority Foundation, Inc., Friends of the Earth Foundation, Inc., Mountain States Legal Foundation, National Right to Life Educational Foundation, Planned Parenthood Federation of America, Scientists and Engineers for Secure Energy, Inc., and Union of Concerned Scientists Fund, Inc. See Internal Revenue Service, Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954, pp. 31, 221, 376, 518, 670, 677, 694, 795, 880, 1001, 1073 (Revised Oct. 1981). It would be difficult indeed to argue that each of these organizations reflects the views of the "common community conscience" or "demonstrably . . . [is] in harmony with the public interest." In identifying these organizations, largely taken at random from the tens of thousands on the list, I of course do not imply disapproval of their being exempt from taxation. Rather, they illustrate the commendable tolerance by our Government of even the most strongly held divergent views, including views that at least from time to time are "at odds" with the position of our Government. We have consistently recognized that such disparate groups are entitled to share the privilege of tax exemption.

[4] "A distinctive feature of America's tradition has been respect for diversity. This has been characteristic of the peoples from numerous lands who have built our country. It is the essence of our democratic system." *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 745 (1982) (POWELL, J., dissenting). Sectarian schools make an important contribution to this tradition, for they "have provided an educational alternative for millions of young Americans" and "often afford wholesome competition with our public schools." *Wolman* v. *Walter*, 433 U. S. 229, 262 (1977) (POWELL, J., concurring in part, concurring in judgment in part, and dissenting in part).

I would emphasize, however, that the balancing of these substantial interests is for *Congress* to perform. I am unwilling to join any suggestion that the Internal Revenue Service is invested with authority to decide which public policies are sufficiently "fundamental" to require denial of tax exemptions. Its business is to administer laws designed to produce revenue for the Government, not to promote "public policy." As former IRS Commissioner Kurtz has noted, questions concerning religion and civil rights "are far afield from the more typical tasks of tax administrators—determining taxable income." Kurtz, Difficult Definitional Problems in Tax Administration: Religion and Race, 23 Catholic Lawyer 301 (1978). This Court often has expressed concern that the scope of an agency's authorization be limited to those areas in which the agency fairly may be said to have expertise,[5] and this concern applies with special force when the asserted administrative power is one to determine the scope of public policy. As JUSTICE BLACKMUN has noted:

> "[W]here the philanthropic organization is concerned, there appears to be little to circumscribe the almost unfettered power of the Commissioner. This may be very well so long as one subscribes to the particular brand of social policy the Commissioner happens to be advocating

---

[5] See, *e. g., Community Television of Southern California* v. *Gottfried,* 459 U. S. 498, 510–511, n. 17 (1983) ("[A]n agency's general duty to enforce the public interest does not require it to assume responsibility for enforcing legislation that is not directed at the agency"); *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 114 (1976) ("It is the business of the Civil Service Commission to adopt and enforce regulations which will best promote the efficiency of the federal civil service. That agency has no responsibility for foreign affairs, for treaty negotiations, for establishing immigration quotas or conditions of entry, or for naturalization policies"); *NAACP* v. *FPC,* 425 U. S. 662, 670 (1976) ("The use of the words 'public interest' in the Gas and Power Acts is not a directive to the [Federal Power] Commission to seek to eradicate discrimination, but, rather, is a charge to promote the orderly production of supplies of electric energy and natural gas at just and reasonable rates").

at the time . . . , but application of our tax laws should not operate in so fickle a fashion. Surely, social policy in the first instance is a matter for legislative concern." *Commissioner* v. *"Americans United" Inc.*, 416 U. S. 752, 774–775 (1974) (dissenting opinion).

## III

The Court's decision upholds IRS Revenue Ruling 71–447, and thus resolves the question whether tax-exempt status is available to private schools that openly maintain racially discriminatory admissions policies. There no longer is any justification for *Congress* to hesitate—as it apparently has—in articulating and codifying its desired policy as to tax exemptions for discriminatory organizations. Many questions remain, such as whether organizations that violate other policies should receive tax-exempt status under § 501(c)(3). These should be legislative policy choices. It is not appropriate to leave the IRS "on the cutting edge of developing national policy." Kurtz, *supra*, at 308. The contours of public policy should be determined by Congress, not by judges or the IRS.

JUSTICE REHNQUIST, dissenting.

The Court points out that there is a strong national policy in this country against racial discrimination. To the extent that the Court states that Congress in furtherance of this policy could deny tax-exempt status to educational institutions that promote racial discrimination, I readily agree. But, unlike the Court, I am convinced that Congress simply has failed to take this action and, as this Court has said over and over again, regardless of our view on the propriety of Congress' failure to legislate we are not constitutionally empowered to act for it.

In approaching this statutory construction question the Court quite adeptly avoids the statute it is construing. This I am sure is no accident, for there is nothing in the language

of § 501(c)(3) that supports the result obtained by the Court. Section 501(c)(3) provides tax-exempt status for:

> "Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." 26 U. S. C. § 501(c)(3).

With undeniable clarity, Congress has explicitly defined the requirements for § 501(c)(3) status. An entity must be (1) a corporation, or community chest, fund, or foundation, (2) organized for one of the eight enumerated purposes, (3) operated on a nonprofit basis, and (4) free from involvement in lobbying activities and political campaigns. Nowhere is there to be found some additional, undefined public policy requirement.

The Court first seeks refuge from the obvious reading of § 501(c)(3) by turning to § 170 of the Internal Revenue Code, which provides a tax deduction for contributions made to § 501(c)(3) organizations. In setting forth the general rule, § 170 states:

> "There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if ver-

ified under regulations prescribed by the Secretary."
26 U. S. C. § 170(a)(1).

The Court seizes the words "charitable contribution" and
with little discussion concludes that "[o]n its face, therefore,
§ 170 reveals that Congress' intention was to provide tax
benefits to organizations serving charitable purposes," inti-
mating that this implies some unspecified common-law chari-
table trust requirement. *Ante,* at 587.

The Court would have been well advised to look to subsec-
tion (c) where, as § 170(a)(1) indicates, Congress has defined a
"charitable contribution":

> "For purposes of this section, the term 'charitable con-
> tribution' means a contribution or gift to or for the use of
> . . . [a] corporation, trust, or community chest, fund, or
> foundation . . . organized and operated exclusively for
> religious, charitable, scientific, literary, or educational
> purposes, or to foster national or international amateur
> sports competition (but only if no part of its activities in-
> volve the provision of athletic facilities or equipment), or
> for the prevention of cruelty to children or animals; . . .
> no part of the net earnings of which inures to the benefit
> of any private shareholder or individual; and . . . which
> is not disqualified for tax exemption under section 501(c)
> (3) by reason of attempting to influence legislation, and
> which does not participate in, or intervene in (including
> the publishing or distributing of statements), any politi-
> cal campaign on behalf of any candidate for public office."
> 26 U. S. C. § 170(c).

Plainly, § 170(c) simply tracks the requirements set forth in
§ 501(c)(3). Since § 170 is no more than a mirror of § 501(c)(3)
and, as the Court points out, § 170 followed § 501(c)(3) by
more than two decades, *ante,* at 587, n. 10, it is at best of
little usefulness in finding the meaning of § 501(c)(3).

Making a more fruitful inquiry, the Court next turns to the
legislative history of § 501(c)(3) and finds that Congress in-

tended in that statute to offer a tax benefit to organizations that Congress believed were providing a public benefit. I certainly agree. But then the Court leaps to the conclusion that this history is proof Congress intended that an organization seeking § 501(c)(3) status "must fall within a category specified in that section *and must demonstrably serve and be in harmony with the public interest.*" *Ante,* at 592 (emphasis added). To the contrary, I think that the legislative history of § 501(c)(3) unmistakably makes clear that *Congress has decided* what organizations are serving a public purpose and providing a public benefit within the meaning of § 501(c)(3) and has clearly set forth in § 501(c)(3) the characteristics of such organizations. In fact, there are few examples which better illustrate Congress' effort to define and redefine the requirements of a legislative Act.

The first general income tax law was passed by Congress in the form of the Tariff Act of 1894. A provision of that Act provided an exemption for "corporations, companies, or associations organized and conducted solely for charitable, religious, or educational purposes." Ch. 349, § 32, 28 Stat. 556 (1894). The income tax portion of the 1894 Act was held unconstitutional by this Court, see *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S. 601 (1895), but a similar exemption appeared in the Tariff Act of 1909 which imposed a tax on corporate income. The 1909 Act provided an exemption for "any corporation or association organized and operated exclusively for religious, charitable, or educational purposes, no part of the net income of which inures to the benefit of any private stockholder or individual." Ch. 6, § 38, 36 Stat. 113 (1909).

With the ratification of the Sixteenth Amendment, Congress again turned its attention to an individual income tax with the Tariff Act of 1913. And again, in the direct predecessor of § 501(c)(3), a tax exemption was provided for "any corporation or association organized and operated exclusively for religious, charitable, scientific, or educational purposes,

no part of the net income of which inures to the benefit of any private stockholder or individual." Ch. 16, § II(G)(a), 38 Stat. 172 (1913). In subsequent Acts Congress continued to broaden the list of exempt purposes. The Revenue Act of 1918 added an exemption for corporations or associations organized "for the prevention of cruelty to children or animals." Ch. 18, § 231(6), 40 Stat. 1057, 1076 (1918). The Revenue Act of 1921 expanded the groups to which the exemption applied to include "any community chest, fund, or foundation" and added "literary" endeavors to the list of exempt purposes. Ch. 136, § 231(6), 42 Stat. 253 (1921). The exemption remained unchanged in the Revenue Acts of 1924, 1926, 1928, and 1932.[1] In the Revenue Act of 1934 Congress added the requirement that no substantial part of the activities of any exempt organization can involve the carrying on of "propaganda" or "attempting to influence legislation." Ch. 277, § 101(6), 48 Stat. 700 (1934). Again, the exemption was left unchanged by the Revenue Acts of 1936 and 1938.[2]

The tax laws were overhauled by the Internal Revenue Code of 1939, but this exemption was left unchanged. Ch. 1, § 101(6), 53 Stat. 33 (1939). When the 1939 Code was replaced with the Internal Revenue Code of 1954, the exemption was adopted in full in the present § 501(c)(3) with the addition of "testing for public safety" as an exempt purpose and an additional restriction that tax-exempt organizations could not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." Ch. 1, § 501(c) (3), 68A Stat. 163 (1954). Then in 1976 the statute was again amended adding to the purposes for which an exemption would be authorized, "to foster national or international ama-

---

[1] See Revenue Act of 1924, ch. 234, § 231(6), 43 Stat. 282; Revenue Act of 1926, ch. 27, § 231(6), 44 Stat. 40; Revenue Act of 1928, ch. 852, § 103(6), 45 Stat. 813; Revenue Act of 1932, ch. 209, § 103(6), 47 Stat. 193.

[2] See Revenue Act of 1936, ch. 690, § 101(6), 49 Stat. 1674; Revenue Act of 1938, ch. 289, § 101(6), 52 Stat. 481.

teur sports competition," provided the activities did not involve the provision of athletic facilities or equipment. Tax Reform Act of 1976, Pub. L. 94–455, § 1313(a), 90 Stat. 1730 (1976).

One way to read the opinion handed down by the Court today leads to the conclusion that this long and arduous refining process of § 501(c)(3) was certainly a waste of time, for when enacting the original 1894 statute Congress intended to adopt a common-law term of art, and intended that this term of art carry with it all of the common-law baggage which defines it. Such a view, however, leads also to the unsupportable idea that Congress has spent almost a century adding illustrations simply to clarify an already defined common-law term.

Another way to read the Court's opinion leads to the conclusion that even though Congress has set forth *some* of the requirements of a § 501(c)(3) organization, it intended that the IRS additionally require that organizations meet a higher standard of public interest, not stated by Congress, but to be determined and defined by the IRS and the courts. This view I find equally unsupportable. Almost a century of statutory history proves that Congress itself intended to decide what § 501(c)(3) requires. Congress has expressed its decision in the plainest of terms in § 501(c)(3) by providing that tax-exempt status is to be given to any corporation, or community chest, fund, or foundation that is organized for one of the eight enumerated purposes, operated on a nonprofit basis, and uninvolved in lobbying activities or political campaigns. The IRS certainly is empowered to adopt regulations for the enforcement of these specified requirements, and the courts have authority to resolve challenges to the IRS's exercise of this power, but Congress has left it to neither the IRS nor the courts to select or add to the requirements of § 501(c)(3).

The Court suggests that unless its new requirement be added to § 501(c)(3), nonprofit organizations formed to teach pickpockets and terrorists would necessarily acquire tax-ex-

empt status. *Ante,* at 592, n. 18. Since the Court does not challenge the characterization of *petitioners* as "educational" institutions within the meaning of § 501(c)(3), and in fact states several times in the course of its opinion that petitioners *are* educational institutions, see, *e. g., ante,* at 580, 583, 604, n. 29, 606, n. 32, it is difficult to see how this argument advances the Court's reasoning for disposing of petitioners' cases.

But simply because I reject the Court's heavyhanded creation of the requirement that an organization seeking § 501(c)(3) status must "serve and be in harmony with the public interest," *ante,* at 592, does not mean that I would deny to the IRS the usual authority to adopt regulations further explaining what Congress meant by the term "educational." The IRS has fully exercised that authority in Treas. Reg. § 1.501(c)(3)–1(d)(3), 26 CFR § 1.501(c)(3)–1(d)(3) (1982), which provides:

"(3) *Educational defined*—(i) *In general.* The term 'educational', as used in section 501(c)(3), relates to—

"(a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or

"(b) The instruction of the public on subjects useful to the individual and beneficial to the community.

"An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

"(ii) *Examples of educational organizations.* The following are examples of organizations which, if they otherwise meet the requirements of this section, are educational:

"*Example (1)*. An organization, such as a primary or secondary school, a college, or a professional or trade school, which has a regularly scheduled curriculum, a regular faculty, and a regularly enrolled body of students in attendance at a place where the educational activities are regularly carried on.

"*Example (2)*. An organization whose activities consist of presenting public discussion groups, forums, panels, lectures, or other similar programs. Such programs may be on radio or television.

"*Example (3)*. An organization which presents a course of instruction by means of correspondence or through the utilization of television or radio.

"*Example (4)*. Museums, zoos, planetariums, symphony orchestras, and other similar organizations."

I have little doubt that neither the "Fagin School for Pickpockets" nor a school training students for guerrilla warfare and terrorism in other countries would meet the definitions contained in the regulations.

Prior to 1970, when the charted course was abruptly changed, the IRS had continuously interpreted § 501(c)(3) and its predecessors in accordance with the view I have expressed above. This, of course, is of considerable significance in determining the intended meaning of the statute. *NLRB* v. *Boeing Co.*, 412 U. S. 67, 75 (1973); *Power Reactor Development Co.* v. *Electrical Workers*, 367 U. S. 396, 408 (1961).

In 1970 the IRS was sued by parents of black public school children seeking to enjoin the IRS from according tax-exempt status under § 501(c)(3) to private schools in Mississippi that discriminated against blacks. The IRS answered, consistent with its longstanding position, by maintaining a lack of authority to deny the tax exemption if the schools met the specified requirements of § 501(c)(3). Then "[i]n the midst of this litigation," *Green* v. *Connally*, 330 F. Supp. 1150, 1156 (DC), summarily aff'd *sub nom*. *Coit* v. *Green*, 404 U. S. 997 (1971), and in the face of a preliminary injunc-

tion, the IRS changed its position and adopted the view of the plaintiffs.

Following the close of the litigation, the IRS published its new position in Revenue Ruling 71–447, stating that "a school asserting a right to the benefits provided for in section 501(c)(3) of the Code as being organized and operated exclusively for educational purposes must be a common law charity in order to be exempt under that section." Rev. Rul. 71–447, 1971–2 Cum. Bull. 230. The IRS then concluded that a school that promotes racial discrimination violates public policy and therefore cannot qualify as a common-law charity. The circumstances under which this change in interpretation was made suggest that it is entitled to very little deference. But even if the circumstances were different, the latter-day wisdom of the IRS has no basis in § 501(c)(3).

Perhaps recognizing the lack of support in the statute itself, or in its history, for the 1970 IRS change in interpretation, the Court finds that "[t]he actions of Congress since 1970 leave no doubt that the IRS reached the correct conclusion in exercising its authority," concluding that there is "an unusually strong case of legislative acquiescence in and ratification by implication of the 1970 and 1971 rulings." *Ante,* at 599. The Court relies first on several bills introduced to overturn the IRS interpretation of § 501(c)(3). *Ante,* at 600, and n. 25. But we have said before, and it is equally applicable here, that this type of congressional inaction is of virtually no weight in determining legislative intent. See *United States* v. *Wise,* 370 U. S. 405, 411 (1962); *Waterman S.S. Corp.* v. *United States,* 381 U. S. 252, 269 (1965). These bills and related hearings indicate little more than that a vigorous debate has existed in Congress concerning the new IRS position.

The Court next asserts that "Congress affirmatively manifested its acquiescence in the IRS policy when it enacted the present § 501(i) of the Code," a provision that "denies tax-exempt status to social clubs whose charters or policy state-

ments provide for" racial discrimination.   *Ante*, at 601. Quite to the contrary, it seems to me that in § 501(i) Congress showed that when it wants to add a requirement prohibiting racial discrimination to one of the tax-benefit provisions, it is fully aware of how to do it.   Cf. *Commissioner* v. *Tellier*, 383 U. S. 687, 693, n. 10 (1966).

The Court intimates that the Ashbrook and Dornan Amendments also reflect an intent by Congress to acquiesce in the new IRS position.   *Ante*, at 602, n. 27.   The amendments were passed to limit certain enforcement procedures proposed by the IRS in 1978 and 1979 for determining whether a school operated in a racially nondiscriminatory fashion.   The Court points out that in proposing his amendment, Congressman Ashbrook stated: "'My amendment very clearly indicates on its face that all the regulations in existence as of August 22, 1978, would not be touched.'"   *Ibid.* The Court fails to note that Congressman Ashbrook also said:

> "The IRS has no authority to create public policy. . . . So long as the Congress has not acted to set forth a national policy respecting denial of tax exemptions to private schools, it is improper for the IRS or any other branch of the Federal Government to seek denial of tax-exempt status. . . . There exists but a single responsibility which is proper for the Internal Revenue Service: To serve as tax collector."   125 Cong. Rec. 18444 (1979).

In the same debate, Congressman Grassley asserted: "Nobody argues that racial discrimination should receive preferred tax status in the United States.   However, the IRS should not be making these decisions on the agency's own discretion.   Congress should make these decisions."   *Id.*, at 18448.   The same debates are filled with other similar statements.   While on the whole these debates do not show conclusively that Congress believed the IRS had exceeded its authority with the 1970 change in position, they likewise are

far less than a showing of acquiescence in and ratification of the new position.

This Court continuously has been hesitant to find ratification through inaction. See *United States* v. *Wise, supra.* This is especially true where such a finding "would result in a construction of the statute which not only is at odds with the language of the section in question and the pattern of the statute taken as a whole, but also is extremely far reaching in terms of the virtually untrammeled and unreviewable power it would vest in a regulatory agency." *SEC* v. *Sloan,* 436 U. S. 103, 121 (1978). Few cases would call for more caution in finding ratification by acquiescence than the present ones. The new IRS interpretation is not only far less than a long-standing administrative policy, it is at odds with a position maintained by the IRS, and unquestioned by Congress, for several decades prior to 1970. The interpretation is unsupported by the statutory language, it is unsupported by legislative history, the interpretation has led to considerable controversy in and out of Congress, and the interpretation gives to the IRS a broad power which until now Congress had kept for itself. Where in addition to these circumstances Congress has shown time and time again that it is ready to enact positive legislation to change the Tax Code when it desires, this Court has no business finding that Congress has adopted the new IRS position by failing to enact legislation to reverse it.

I have no disagreement with the Court's finding that there is a strong national policy in this country opposed to racial discrimination. I agree with the Court that Congress has the power to further this policy by denying § 501(c)(3) status to organizations that practice racial discrimination.[3] But as of yet Congress has failed to do so. Whatever the reasons for the failure, this Court should not legislate for Congress.[4]

---

[3] I agree with the Court that such a requirement would not infringe on petitioners' First Amendment rights.

[4] Because of its holding, the Court does not have to decide whether it would violate the equal protection component of the Fifth Amendment for

Petitioners are each organized for the "instruction or training of the individual for the purpose of improving or developing his capabilities," 26 CFR § 1.501(c)(3)–1(d)(3) (1982), and thus are organized for "educational purposes" within the meaning of § 501(c)(3). Petitioners' nonprofit status is uncontested. There is no indication that either petitioner has been involved in lobbying activities or political campaigns. Therefore, it is my view that unless and until Congress affirmatively amends § 501(c)(3) to require more, the IRS is without authority to deny petitioners § 501(c)(3) status. For this reason, I would reverse the Court of Appeals.

---

Congress to grant § 501(c)(3) status to organizations that practice racial discrimination. *Ante*, at 599, n. 24. I would decide that it does not. The statute is facially neutral; absent a showing of a discriminatory purpose, no equal protection violation is established. *Washington* v. *Davis*, 426 U. S. 229, 241–244 (1976).