ESTATE OF SAMUEL C. SACHS, DECEASED, STEPHEN C.
SACHS, SOPHIA R. SACHS, COEXECUTORS,
PETITIONERS v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 9823-84.           Filed April 6, 1987.

*Jerome W. Sandweiss* and *Mark Z. Schraier*, for the
petitioners.
*Steven W. LaBounty*, for the respondent.

## OPINION

COHEN, *Judge*: Respondent determined a deficiency of
$516,365.63 in petitioners' Federal estate tax. In an amend-
ment to answer, respondent also asserted an additional
deficiency of $58,678.62. The issues for decision are: (1)
Whether gift tax paid by the donees of net gifts made
within 3 years of decedent's death is includable in dece-
dent's gross estate under section 2035(c);[1] (2) whether
petitioners are entitled to a deduction under section
2053(a)(3) for a Federal income tax claim arising from the

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of
1954 as amended and in effect at the date of decedent's death.

net gift when the claim was retroactively waived by the Tax Reform Act of 1984; and (3) whether certain "flower bonds" included in the gross estate should be valued at par.

The facts of this case have been fully stipulated, and the facts set forth in the stipulation are incorporated as our findings by this reference.

Samuel C. Sachs (decedent) died on June 27, 1980. Sophia R. Sachs, decedent's widow, and Stephen C. Sachs, one of decedent's grandchildren, are coexecutors of decedent's estate. The principal office of the estate was located in St. Louis, Missouri, when the petition was filed.

On April 10, 1978, decedent gave 14,000 shares of Sachs Holding Co. to each of three irrevocable trusts established for the benefit of his grandchildren (the trusts). Article ninth of the trust instrument provided, in relevant part, that decedent's gift was "made subject to and upon the conditions * * * that the Trustees shall promptly pay, or cause to be paid, any and all gift taxes which may be found to be due to the United States because of the making of such gifts."

Decedent and his wife reported the gifts as split, net gifts on gift tax returns for the calendar quarter ended June 30, 1978. The donee trusts paid a gift tax of $612,700, and, pursuant to section 2512, an amount equal to the tax paid by the donee trusts was not included in the gift tax base. Thus, although the 42,000 shares were worth $2,399,044 on the date of the gift, decedent and his wife reported the three net gifts at an aggregate value of $1,786,340 (sic). Through a separate gift of cash, Mr. and Mrs. Louis S. Sachs, the parents of decedent's grandchildren, provided the trusts with $591,000 of the amount used to pay the gift tax on decedent's gift.

Pursuant to section 2035, the shares transferred to the trusts were included in decedent's gross estate at date of death value ($2,196,180) reduced by the amount of gift tax ($612,700) paid by the donee trusts. Although the gift tax paid by the trusts was not included in the gross estate, in the computation of estate tax it was deducted under section 2001(b)(2) from the tentative estate tax computed under section 2001(b)(1). In his notice of deficiency, respondent

determined that the gift tax paid by the trusts is included in decedent's gross estate pursuant to section 2035(c).

On the estate tax return, certain Treasury bonds (flower bonds) were included in the gross estate at par value to the extent such par value did not exceed the amount of the estate taxes payable. The remaining flower bonds were included in the gross estate at their date of death value. The bonds' date of death value was less than their par value.

In 1982, the Supreme Court held that a donor's gross income includes the excess of gift tax paid by the donee over the donor's basis in the given property. *Diedrich v. Commissioner*, 457 U.S. 191 (1982). Petitioners, by Form 870 waiver, consequently agreed to recognize additional income of $584,700 attributable to the 1978 net gift. This additional income resulted in an income tax liability of $208,918.97 and accrued interest thereon of $20,116.32. On December 3, 1982, petitioners paid the additional income tax and accrued interest. Respondent's notice of estate tax deficiency allowed additional section 2053(a)(3) deductions for petitioners' income tax and interest liabilities.

Section 1026 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1031, provides that for gifts made prior to March 4, 1981, the donor's gross income shall not include any amount attributable to the donee's payment of gift tax. Pursuant to this statute, petitioners claimed a refund of the additional income tax and interest paid in response to the Supreme Court's holding in *Diedrich*.

In settlement of a related case involving decedent's 1978 income tax liability, the parties agreed that decedent's 1978 gross income did not include the excess of the gift tax paid by the trusts over decedent's adjusted basis in the shares. The parties also agreed that decedent had a 1978 income tax deficiency of $132,039 attributable to other items, together with interest thereon, and that petitioners are entitled to an additional estate tax deduction corresponding to this liability. Respondent subsequently moved to amend his answer in this case to disallow the section 2053(a)(3) deductions attributable to income arising from the donee's payment of gift tax. In his amended answer, respondent

asserted an increased estate tax deficiency in the amount of $58,678.62.

## Section 2035(c)

Section 2035[2] provides:

SEC. 2035. ADJUSTMENTS FOR GIFTS MADE WITHIN 3 YEARS OF DECEDENT'S DEATH

(a) INCLUSION OF GIFTS MADE BY DECEDENT.—Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death.

(b) EXCEPTIONS.—Subsection (a) shall not apply—

(1) to any bona fide sale for an adequate and full consideration in money or money's worth; and

(2) to any gift to a donee made during a calendar year if the decedent was not required by section 6019 to file any gift tax return for such year with respect to gifts to such donee.

Paragraph (2) shall not apply to any transfer with respect to a life insurance policy.

(c) INCLUSION OF GIFT TAX ON CERTAIN GIFTS MADE DURING 3 YEARS BEFORE DECEDENT'S DEATH.—The amount of the gross estate (determined without regard to this subsection) shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or his spouse after December 31, 1976, and during the 3-year period ending on the date of the decedent's death.

Petitioners contend that section 2035(c) does not "gross-up" decedent's estate to include gift tax paid by the donee on a net gift made within 3 years of decedent's death. Petitioners maintain that gift tax paid by the donee trusts is not tax paid by "the decedent or his estate" and argue that the "concise and unambiguous" language of the statute thus dictates our decision.

Respondent contends that section 2035(c) reaches gift tax paid by the donee of any gift included in decedent's gross estate pursuant to section 2035(a). Respondent argues that the legislative history of section 2035(c) supports this construction of the statute.

The Supreme Court has stated:

---

[2]Sec. 2035 was substantially modified by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 424(a), 95 Stat. 172, 317. Sec. 2035(d) now provides that sec. 2035(a) applies only to transfers described in sec. 2036, 2037, 2038, or 2042, and in certain other special situations. Sec. 2035(c) remains fully applicable to post-1981 decedents. Our analysis focuses on the law in effect on June 27, 1980, the date of decedent's death.

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. * * * [*United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940), quoting *Ozawa v. United States*, 260 U.S. 178, 194 (1922). Fn. refs. omitted.]

The Supreme Court has recently reaffirmed this "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *California Federal Savings & Loan Association, et al. v. Mark Guerra, Director, Department of Fair Employment and Housing, et al.*, 479 U.S. __ (1987), quoting *Steelworkers v. Weber*, 443 U.S. 193, 201 (1979), and *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892).

Thus, although we are not "free * * * to twist [the Code] beyond the contours of its plain and unambiguous language in order to comport with good policy" (*Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984)), we may go beyond the literal language of the Code if reliance on that language would defeat the plain purpose of Congress. *Bob Jones University v. United States*, 461 U.S. 574, 586 (1983); see *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892); *Abdalla v. Commissioner*, 647 F.2d 487, 496 (5th Cir. 1981), and cases cited therein. Because "words do not have an immutable meaning," we have interpreted the Code in a manner contrary to its literal wording where necessary to implement clearly expressed congressional intent. *Carson v. Commissioner*, 71 T.C. 252, 262 (1978), affd. 641 F.2d 864 (10th Cir. 1979); *Focht v. Commissioner*, 68 T.C. 223 (1977); *Carasso v. Commissioner*, 34 T.C. 1139, 1142 (1960), affd. 292 F.2d 367 (2d Cir. 1961). In the absence of "unequivocal evidence of legislative purpose," we have applied the law as written. *Huntsberry v. Commissioner*, 83 T.C. 742, 747-748 (1984).

Application of the literal language of section 2035(c) would dictate a result inconsistent with the architecture of the transfer tax system. This case thus presents circumstances "plainly at variance with the policy of the legislation as a whole" that warrant our search for unequivocal evidence of the purpose of section 2035(c).

In 1916, when the Federal estate tax was first enacted, there was no Federal gift tax. As a result, property given away during a decedent's life would escape the estate tax if not somehow brought back into the gross estate for tax purposes. Congress attempted to prevent depletion of the estate tax base by including certain types of lifetime gifts in the gross estate. See 5 B. Bittker, Federal Taxation of Income, Estates, and Gifts 126-133 (1984). The 1916 estate tax thus reached all transfers of property "intended to take effect in possession or enjoyment" at or after the decedent's death: this clause was the predecessor of sections 2036-2038. Sec. 202(b), Revenue Act of 1916, ch. 463, 39 Stat. 777, 778; see B. Bittker, *supra.* The tax was also imposed on all transfers made "in contemplation of * * * death"; this clause was the predecessor of section 2035. Revenue Act of 1916, *supra*; B. Bittker, *supra* at 126-134.

In 1932, the predecessor of the current Federal gift tax was first enacted. Sec. 501, Revenue Act of 1932, ch. 209, 47 Stat. 245. An important purpose of the gift tax was to prevent or compensate for avoidance of the estate tax. *Sanford's Estate v. Commissioner,* 308 U.S. 39, 44 (1939); S. Rept. 665, 72d Cong., 1st Sess. (1932), 1939-1 C.B. (Part 2) 496, 525. In its report, the Senate Finance Committee stated that "the design is to impose a tax which measurably approaches the estate tax which would have been payable on the donor's death had the gifts not been made." S. Rept. 665, *supra.* The gift tax was thus said to supplement the estate tax. *Merrill v. Fahs,* 324 U.S. 308, 311 (1945); *Smith v. Shaughnessy,* 318 U.S. 176, 179 (1943); *Sanford's Estate v. Commissioner, supra.* The draftsmen of the 1932 legislation realized that the new gift tax would reach lifetime transfers included in the decedent's gross estate under the predecessors of sections 2035-2038 and authorized an estate tax credit for the gift tax paid on such

transfers. Sec. 402, Revenue Act of 1932, ch. 209, 47 Stat. 245; S. Rept. 665, *supra*, 1939-1 C.B. (Part 2) at 424; see B. Bittker, *supra* at 126-134.

The gift tax did not live up to congressional expectations. Lawmakers identified three factors that allowed taxpayers to reduce overall transfer tax liability by making lifetime gifts. H. Rept. 94-1380 (1976), 1976-3 C.B. (Vol. 3) 735, 742, 745; Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 1, 538.[3] First, gift tax rates were consistently lower than estate tax rates. Second, estate taxes and gift taxes considered together were noncumulative; the estate remaining at death was subject to tax at the lowest rates of a schedule entirely separate from the gift tax schedule. Taxpayers could thus reduce the progressivity of the estate tax by making lifetime gifts. Finally, funds used to pay gift tax were not included in either tax base. Although funds used to pay gift tax were not included in the gift tax base and reduced the value of the estate retained by the donor, the estate tax base included the full value of all property retained until death, even though a portion might be required to pay estate tax. "Thus, even if the applicable transfer tax rates were the same, the net amount transferred to a beneficiary from a given pre-tax amount of property was greater for a lifetime transfer solely because of the difference in the tax bases." General Explanation, *supra*, 1976-3 C.B. (Vol. 2) at 538.

The 1976 Tax Reform Act, Pub. L. 94-445, 90 Stat. 1525 (the 1976 Act), did much to reduce the disparity of treatment between lifetime gifts and transfers at death. The act established a unified cumulative rate schedule and a unified credit to replace the separate rate schedules and exemptions of prior law. Under current law, gift tax payable in any given period is determined by applying the unified rate schedule to the donor's cumulative lifetime taxable gifts and then subtracting the taxes payable for previous taxable periods. Sec. 2502. Estate tax payable is determined by applying the unified rate schedule to the aggregate sum

---

[3]Although the General Explanation, or "Blue Book," prepared by the staff of the Joint Committee is technically not considered "legislative history" of the Tax Reform Act of 1976, the Supreme Court has relied on such a Blue Book in its analysis of another tax statute. See *FPC v. Memphis Light, Gas & Water Div.*, 411 U.S. 458, 471-472 (1973).

of lifetime and "deathtime" transfers and then subtracting the gift taxes payable on the lifetime transfers. Sec. 2001. Gift taxes are thus, in a sense, "downpayments" on the taxpayer's ultimate transfer tax liability, which is not determined until after the taxpayer's death.

The 1976 Act also sharpened the distinction between lifetime gifts and "deathbed" gifts, i.e., gifts made within 3 years of the taxpayer's demise. Lifetime transfers included in the tax base as gifts are described as "adjusted taxable gifts," in section 2001(b). Lifetime transfers included in the tax base as part of decedent's gross estate (i.e., transfers described in sections 2035 through 2038) are not "adjusted taxable gifts." Sec. 2001(b). Under prior law, gifts made within 3 years of death were presumed to be made "in contemplation of death" and were included in the gross estate unless the executor could prove otherwise. Sec. 2035(a), I.R.C. 1939. The 1976 Act eliminated this rebuttable presumption and amended section 2035(a) to provide that the gross estate shall include *all* gifts made within 3 years of death. Tax Reform Act of 1976, *supra*, section 2001(a)(5).

Congress carefully distinguished "deathbed" gifts from other lifetime gifts because, although the 1976 Act reduced the disparity of treatment between gifts and transfers at death, the act retained several provisions favoring lifetime gifts. See H. Rept. 94-1380, *supra*, 1976-3 C.B. (Vol. 3) at 745-746; General Explanation, *supra*, 1976-3 C.B. (Vol. 2) 1, 538. The annual gift tax exclusion of $3,000 per donee was retained. Donors of lifetime gifts continued to avoid tax on appreciation that might accrue between the date of a gift and the date of the taxpayer's death. The 1976 Act also left undisturbed prior law under which funds used to pay gift tax are not included in the transfer tax base. Sec. 2512; see Rev. Rul. 75-72, 1975-1 C. B. 310 (1975); Rev. Rul. 81-223, 1981-2 C.B. 189 (1981).

The provisions that favor other lifetime gifts are not generally applicable to gifts made within 3 years of death. Although the annual gift tax exclusion of $3,000 per donee is available to the taxpayer in the year of gift, the benefit of the exclusion is in many cases eliminated by section 2035, which can bring the *entire* amount of the taxable

deathbed gift into the estate tax base. Section 2035(a) also eliminates the possibility of avoiding tax on appreciation that might accrue between the date of gift and the date of death; gifts are included in the gross estate at date of death value. Section 2035(c) includes in the tax base funds used by the donor or his estate to pay the gift tax.

Insistence on the literal language of section 2035(c) would distort the framework erected by the Tax Reform Act of 1976. The act retained some of the prior law's preferences for lifetime gifts; however, these preferences were not made available to deathbed gifts. Petitioners' construction of section 2035(c) extends the benefit of one such preference to deathbed net gifts. Mechanical application of section 2035(c) would completely remove from the transfer tax base all funds used to pay gift tax on such gifts. This interpretation of the statute is wholly inconsistent with Congress' goal of sharply distinguishing deathbed gifts from other gifts and eliminating the disparity of treatment between deathbed gifts and transfers at death.

The legislative history of section 2035(c) confirms our analysis. The House Committee on Ways and Means stated:

> Since the gift tax paid on a lifetime transfer which is included in a decedent's gross estate is taken into account both as a credit against the estate tax and also as a reduction in the estate tax base, substantial tax savings can be derived under present law by making so-called "deathbed gifts" even though the transfer is subject to both taxes. To eliminate this tax avoidance technique, the committee believes that the gift tax paid on transfers made within 3 years of death *should in all cases* be included in the decedent's gross estate. This "gross-up" rule will eliminate any incentive to make deathbed transfers to remove an amount equal to the gift taxes from the transfer tax base. [H. Rept. 94-1380, *supra*, 1976-3 C.B. (Vol. 3) at 746. Emphasis supplied.]

Our analysis is also consistent with the Supreme Court's holding in *Diedrich v. Commissioner*, 457 U.S. 191 (1982). In *Diedrich*, the Court held that a donor's gross income includes the excess of gift tax paid by the donee over the donor's basis in the given property. The Court noted that the donor is liable for payment of gift tax and held that under *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929), and *Crane v. Commissioner*, 331 U.S. 1 ( 1947), relief of the donor's liability to the Government must be treated as indirect income. *Diedrich v. Commissioner*, 457 U.S. at

195; see sec. 2502(d). In this case, as in *Diedrich, Old Colony,* and *Crane,* the substance of decedent's transaction dictates our decision. Decedent was primarily liable for payment of the gift tax. As donor of a net gift, he may be deemed to have paid the tax by ordering the donee to pay it over to the Internal Revenue Service on his behalf in satisfaction of his gift tax liability. Decedent gave property worth $2,399,044 to the trusts. Because the trusts paid gift tax in the amount of $612,700, decedent and his wife reported the three net gifts at an aggregate value of $1,786,340 (sic). The funds used to pay the gift tax were thus excluded from the transfer tax base pursuant to section 2512(a). When decedent died, the shares transferred to the trusts were included in his estate at date of death value reduced by the amount of gift tax paid by the donee trusts. But for section 2035(c), $612,700 transferred within 3 years of decedent's death would escape the transfer tax system altogether.

Section 2035(c) speaks of gift taxes "paid * * * by the decedent or his estate" rather than gift taxes "paid" without modification because payment of tax on gifts described in section 2035(a) does not always remove funds from the transfer tax base. The House Committee on Ways and Means explained as follows:

[T]he amount of gift tax paid with respect to transfers made within 3 years of death are to be includable in a decedent's gross estate. This "gross-up" rule for gift taxes eliminates any incentive to make deathbed transfers to remove an amount equal to the gift taxes from the transfer tax base. The amount of gift tax subject to this rule would include tax paid by the decedent or his estate on any gift made by the decedent or his spouse after December 31, 1976. It would not, however, include any gift tax paid by the spouse on a gift made by the decedent within 3 years of death which is treated as made one-half by the spouse, since the spouse's payment of such tax would not reduce the decedent's estate at the time of death. [H. Rept. 94-1380, *supra,* 1976-3 (Vol. 3) C.B. at 748.]

The draftsmen of section 2035(c) thus tailored the statute to accommodate gifts split under section 2513. Although the language selected for this purpose does not, in isolation, describe net deathbed gifts, our analysis of section 2035(c), its legislative history, and the framework erected by the 1976 Act persuades us that Congress did not intend to distinguish net deathbed gifts from other deathbed gifts.

## Section 2053(a)(3)

Section 2053(a)(3) provides that the value of the taxable estate shall be determined by deducting claims against the estate allowable by the laws under which the estate is administered. Taxes that are unpaid on the date of death are deductible under section 2053(a)(3). Sec. 20.2053-6(a), Estate Tax Regs.

Decedent made a substantial net gift in 1978. Decedent died in 1980 and his estate tax return was filed in 1981. In 1982, the Supreme Court held that the donor of a net gift realizes taxable income to the extent that gift tax paid by the donee exceeds the donor's adjusted basis in the property given. *Diedrich v. Commissioner*, 457 U.S. 191 (1982). Petitioners consequently agreed to recognize additional income attributable to decedent's net gift. The estate paid the additional income tax plus interest, and respondent, in his notice of estate tax deficiency, allowed an additional estate tax deduction under section 2053(a)(3).

Petitioners' entitlement to a deduction under section 2053(a) is contingent upon the retroactive effect of the 1984 Tax Reform Act. Section 1026 of the act provides that, for gifts made before March 4, 1981, the donor's income shall not include any amount attributable to the donee's payment of gift tax. Sec. 1026, Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 1031. Pursuant to this law, petitioners claimed that they were entitled to a refund of the 1978 income tax paid under *Diedrich*. In a related case involving decedent's 1978 income tax liability, respondent agreed that decedent's 1978 gross income did not include any amount attributable to the net gift. In an amended answer, respondent asserted an increased estate tax deficiency and claimed that the estate's section 2053(a)(3) deduction for the additional 1978 income tax and interest should be disallowed.

Petitioners note that the predecessor of section 2035 authorized deduction of claims "allowed" by the law under which the estate is administered and make much of the current Code's substitution of "allowable" for "allowed." See sec. 812(b)(3), I.R.C. 1939. Petitioners contend that "Events subsequent to death which change 'allowable' claims to claims which ultimately are not 'allowed' are irrelevant." We do not believe that the substitution of

"allowable" for "allowed" signaled a substantive modification of the law. The 1939 Code's use of the term "allowed" is "not to be construed as meaning that unless a claim against the estate has been allowed by the state court no deduction therefor will be permitted." *Propstra v. United States*, 680 F.2d 1248, 1255 (9th Cir. 1982), quoting *Smyth v. Erikson*, 221 F.2d 1, 3 (9th Cir. 1955). Congress intended the term to mean only that leqally enforceable claims were deductible; claims without legal foundation were not deductible, even if paid. *Propstra v. United States, supra.* The substitution of "allowable" for "allowed" clarified the congressional intent that underlies section 2053. That section does not, therefore, on its face allow petitioners a deduction simply because the Governments' claim was enforceable on the date of decedent's death.

Petitioners also argue that under the doctrine set forth in *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929), "The estate so far as may be is settled as of the date of [decedent's] death." This Court and many others have attempted to formulate a rule pertaining to the effect of post-death events on the allowance of a claim against the estate. See, e.g., *Propstra v. United States*, 680 F.2d at 1254; *Gowetz v. Commissioner*, 320 F.2d 874, 876 (1st Cir. 1963); *Commissioner v. Shively's Estate*, 276 F.2d 372, 374 (2d Cir. 1960); *Commissioner v. Strauss*, 77 F.2d 401, 405 (7th Cir. 1942); *Jacobs v . Commissioner*, 34 F.2d 233, 235 (8th Cir. 1929); *Estate of Chesterton v. United States*, 213 Cl. Ct. 345, 551 F.2d 278, 280 (1977); *Estate of Gilford v. Commissioner*, 88 T.C. at 52-53 (1987); *Estate of Van Horne v. Commissioner*, 78 T.C. 728, 732-739 (1982), affd. 720 F.2d 1114 (9th Cir. 1983); *Estate of Hagmann v. Commissioner*, 60 T.C. 465 (1973), affd. 492 F. 2d 796 (5th Cir. 1974). In *Estate of Van Horne v. Commissioner*, 78 T.C. at 736-737, we observed that "all of the cases in this field dealing with post-death evidence are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision." We analyzed the cases and concluded that although we must consider post-death events in cases where the decedent's creditor has only a potential, unmatured, contingent, or contested claim that requires

further action before it becomes a fixed obligation of the estate, the general principle announced in *Ithaca Trust* is applicable in cases involving the valuation of a claim that is valid and fully enforceable on the date of decedent's death. *Estate of Van Horne v. Commissioner*, 78 T.C. at 734-745.

Any appeal in this case lies to the Court of Appeals for the Eighth Circuit, and we are bound by that court's interpretation of the law in this area, if any. *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). That court last considered this issue in 1929. In *Jacobs v. Commissioner, supra*, the decedent entered into an antenuptial contract with his spouse in which it was agreed that, if she survived him, she would be paid out of his estate the sum of $75,000 in lieu of her rights of dower and other marital rights. The decedent's will provided that the widow could, at her election, accept a life estate in the income produced by $250,000 placed in trust in lieu of the $75,000 stipulated in the antenuptial agreement. Although the widow had elected to accept the alternative offered by the will, the executors of the decedent's estate deducted $75,000 from the value of the gross estate in determining the value of the net estate upon which to calculate the tax. The Commissioner disallowed the deduction. The Court held that the widow's election, which was made almost 3 months after the decedent's death, was relevant to its inquiry and upheld the Commissioner's determination.

*Jacobs v. Commissioner, supra*, involved certain similarities but is factually distinguishable from this case. In this case, the Government's claim against decedent was valid and fully enforceable on the date of decedent's death. As of that time, there was no alternative to payment of the claim. In *Jacobs*, the widow's claim against the estate was also valid and fully enforceable on the date of the decedent's death. The Commissioner conceded that the widow's rights under the antenuptial contract were enforceable. *Jacobs v. Commissioner*, 34 F.2d at 234. She did not need to take any further action to cause the claim to ripen into a fixed obligation of the estate. As noted in *Propstra v. United States, supra*, however, because the decedent's will gave the widow the "power to elect between two alternatives," the

widow's claim was not certain but contingent. *Propstra v. United States*, 680 F.2d at 1256. The decedent's will offered the widow an incentive to waive her claim against the estate, which she did.

In *Jacobs*, the court observed that "the contention in behalf of the estate is built upon the antenuptial contract, and the moment of the death of the deceased as the chief corner stones of the structure. The argument in behalf of the government, on the other hand, makes the election of the widow to take under the provision of the will the decisive fact in the case." *Jacobs v. Commissioner*, 34 F.2d at 234-235. The court stated that:

> The fact that the matter for decision lies within narrow limits does not render its solution less difficult, and for the same reason that it is more difficult to cross a stream over a foot pole than over a bridge. The foot pole is so narrow that balancing is difficult, and the slightest misstep hazardous; the bridge so broad that one is not conscious of balancing, and a misstep usually of no moment. The principle or principles controlling in a narrow case are usually uncertain and elusive. In a case of broader scope, the threads leading toward a correct solution are usually numerous, and to be encountered at many points.
>
> The contentions of the parties are irreconcilable, and neither satisfying. Their consideration has led to the conclusion that the case turns upon what Congress intended to include by the phrase "claims against the estate," found in the statute, rather than upon the antenuptial contract and the moment of the death of the deceased, put forward by the estate, or upon the election of the widow, put forward by the government.

The court concluded that:

> Tax laws deal with actualities, and the rules prescribed by Congress are intended to produce practical results, when applied by untechnical men. We think actuality was the thought foremost in the mind of Congress when it put the phrase "claims against the estate" in this and other Revenue Acts. * * * The widow never claimed anything from the estate under the antenuptial contract, and the gross estate was not decreased one single cent by reason of the $75,000 stipulated in the antenuptial contract. All the logic in the world cannot change these facts. * * *
>
> In our opinion a claim without a claimant was not in the mind or purpose of Congress when the words "claims against the estate" were written into the revenue statutes. The administration of an estate necessarily extends over a period of months, sometimes of years, and always under state laws requiring the orderly presentation and allowance of claims against it. It was, in our opinion, claims presented and allowed or otherwise determined as valid against the estate and actually paid or to be paid that Congress had in mind, when it provided for the deduction

from the gross estate of "claims against the estate" in determining the value of the net estate for tax purposes. [34 F.2d at 235.]

Applying the foregoing analysis, we believe that the ruling of the Court of Appeals in *Jacobs* is limited to circumstances where waiver of a claim is foreseeable on the date of death. In this case, on the other hand, the general legislative waiver only fortuitously affected the estate *after the claim had been paid* in accordance with the law in effect as of the date of death. We believe that the Court of Appeals for the Eighth Circuit, concerned with "practical results, when applied by untechnical men," would not extend the expressly narrow rule of *Jacobs* to this situation. Retroactive changes in the law should not have the effect of delaying the closing of estates by rendering uncertain the determination of tax liabilities. As noted in *Jacobs*, State laws provide for the orderly presentation of claims against an estate. After a finite period of time, claims are barred, and the estate may be closed. See, e.g., Mo. Ann. Stat. sec. 473.360(1) (Vernon Supp. 1986) (claims must be filed within 6 months); *Estate of Hagmann v. Commissioner, supra.* Here, the legislative waiver occurred 4 years after the date of death, at a time when the estate remained open for unrelated reasons. If the estate tax had been finally determined, the 1984 legislation would have had no effect on the estate. To rule that such an unforseeable event at any subsequent time must lead to redetermination of tax liability would be arbitrarily to wreak havoc on the administration of estates. We decline to do so without clearer precedent than *Jacobs*.

### *"Flower Bonds"*

Certain U.S. Treasury bonds known as "flower bonds" were included in decedent's gross estate at market value. On the date of decedent's death, the bonds were worth less than par. Such bonds must be valued at par, if available to pay estate tax. *Banker's Trust Co. v. United States*, 284 F.2d 537, 538 (2d Cir. 1960); *Estate of Fried v. Commissioner*, 54 T.C. 805, 826 (1970), affd. 445 F.2d 979 (2d Cir. 1971). The bonds must also be included in decedent's gross estate at par to the extent that they may be used to pay

interest on the deficiency, as well as the deficiency itself. *Estate of Buchholtz v. Commissioner*, 70 T.C. 814, 816 (1978). Petitioners' only argument with respect to the bonds appears to be that there is no deficiency and that therefore the bonds are not available to pay estate tax. The bonds must be included in decedent's gross estate at par value to the extent that there is a deficiency and they may be used to pay petitioners, estate tax and interest liabilities.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, NIMS, PARKER, SHIELDS, HAMBLEN, CLAPP, SWIFT, GERBER, WRIGHT, and WILLIAMS, *JJ.*, agree with the majority opinion.

---

HAMBLEN, *J.*, concurring: I concur with the majority opinion, and I think it appropriate to respond to Judge Chabot's concurring and dissenting opinion as to the section 2035 issue in that it fails to recognize that a net gift is merely a conduit for the payment of the donor-decedent's tax liability. The net gift concept is a gift made on condition that the donee or a third party pay the tax imposed on the donor of the gift. Consequently, when the donee or other party pays the tax, it is simply an indirect payment by the donor which was reserved as a condition of the gift. As such, the tax paid should be included in the gross-up. Overall congressional intent reflected in the structure of the estate tax provisions of the Revenue Act of 1976 would be frustrated otherwise, and a loophole would be created. The language used in *Gregory v. Helvering*, 293 U.S. 465, 469-470 (1935), affg. 69 F.2d 809 (2d Cir. 1934), is pertinent here:

But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * *

* * * Simply an operation having no business * * * purpose * * * the sole object and accomplishment of which was the consummation of a preconceived plan * * * to transfer a parcel of corporate shares to the petitioner. * * *

\* \* \* The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

Indeed, if the majority opinion has a fault, it is in devoting too much attention to the charge that our rationale departs from the statute. I believe we are simply adhering to the elementary principle of not exalting form over substance. In any realistic view, the gift tax at issue was paid by the donor and, therefore, falls squarely within the statutory language of section 2035(c).

STERRETT, CLAPP, WRIGHT, and WILLIAMS, *JJ.* agree with this concurring opinion.

---

SIMPSON, *J.*, concurring in part and dissenting in part: I agree with the majority's conclusions concerning the flower bonds and the includability in the estate of the gift taxes paid by the donees. I should like to add that, in my judgement, the conclusion that the gift tax is includable in the estate reflects a responsible effort to carry out the legislative objective. Tax legislation is generally carefully drafted, and the complex procedures for enacting such legislation provide many opportunities for perfecting it; nevertheless, oversights do occur, and in my judgment, it is the proper role and responsibility of a court to assist Congress by filling in the niches where possible. In our scheme of Government, Congress has been assigned the responsibility for making policy, and once it has exercised its authority and declared a policy, it then becomes our responsibility to carry out that policy. There can be no genuine doubt over the result intended by section 2035. If we do not hold that the gift tax paid by the donees is includable in the estate, it will simply be necessary for Congress to enact further legislation to achieve its objective.

I must, however, disagree with the majority's conclusion with respect to the deductibility of the claim for income taxes. In my opinion, that conclusion is inconsistent with the established precedents of this Court, and there is no reason for departing from those precedents.

In *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929), the Court had to decide how to treat a claim for a life interest: should the claim be valued on the basis of the mortality tables, or should the Court look to the events that occurred after the death of the decedent. The Court held that the claim was to be valued by reference to the mortality tables and without regard to the events that actually occurred. In *Estate of Hagman v. Commissioner*, 60 T.C. 465 (1973), affd. per curiam 492 F.2d 796 (5th Cir. 1974), this Court had to decide whether, for estate tax purposes, a claim was to be allowed when the creditor failed to file a claim in probate and thereby allowed the debt to lapse. We relied upon the events after death and held that the claim was not allowable for estate tax purposes. Similarly, in *Estate of Courtney v. Commissioner*, 62 T.C. 317 (1974), this Court held that a deduction was not allowable merely because there was a contingent claim against the estate on a mortgage. In *Estate of Theis v. Commissioner*, 81 T.C. 741 (1983), affd. 770 F.2d 981 (11th Cir. 1985), we again took into consideration the events after death and held that a debt was not deductible for estate tax purposes because the creditor had allowed it to lapse under local law.

This Court grappled with the distinction between these cases in *Estate of Van Horne v. Commissioner*, 78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983), and suggested that when the issue involves the valuation of a claim by reference to mortality tables, post-death events are not considered, but when the issue involves the enforceability of a disputed or contingent claim, post-death events are taken into consideration. In the present case, the majority has ignored that distinction. Here, the claim for the income tax liability was disputed at the time of the decedent's death. Later, as a result of the Supreme Court's decision in *Diedrich v. Commissioner*, 457 U.S. 191 (1982), the liability became fixed, and clearly a deduction for that liability was allowable, *at that time*, in computing the estate. However, still later, Congress decided to refund the taxes paid. Obviously, the statute of limitations had not run so that the computation of the estate tax liability was still open. The estate had been allowed a deduction for taxes, but

those taxes had been refunded to it. Thus, it had both the deduction and the money for which the deduction had been allowed. To allow a deduction for a claim which was not required to be paid is, in my opinion, clearly inconsistent with our decisions in *Estate of Hagmann, Courtney,* and *Theis.*

JACOBS and WELLS, *JJ.,* agree with this concurring and dissenting opinion.

---

CHABOT, *J.,* concurring and dissenting: I agree with, and join in, the majority's disposition of the "flower bond" issue. However, on the other issues, the majority hold (1) for respondent, that a gift tax is includable in the estate; and (2) for petitioner, that the estate may deduct a forgiven income tax liability. In doing so, on the second issue they place a complex Court-made rule above the congressional intent (thereby creating a double benefit), and on the first issue they place the congressional intent over the statute. I would reverse the order, holding that the statute should control over the congressional intent and the congressional intent should control over court-made rules. As a result, I would decide the first issue for petitioner and the second issue for respondent.

## I. *Inclusion of Gift Tax*

In the Tax Reform Act of 1976, as part of its effort to integrate the estate and gift transfer taxes (the history of which is outlined by the majority at pp. 774-777 of the opinion), the Congress revised section 2035. The controversy focuses on section 2035(c), which reads as follows:

SEC. 2035. ADJUSTMENTS FOR GIFTS MADE WITHIN 3 YEARS OF DECEDENT'S DEATH.

(c) INCLUSION OF GIFT TAX ON CERTAIN GIFTS MADE DURING 3 YEARS BEFORE DECEDENT'S DEATH.—The amount of the gross estate (determined without regard to this subsection) shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or his spouse after December 31, 1976, and during the 3-year period ending on the date of the decedent's death.

The majority hold that "the literal language of section

2035(c)"[1] would "dictate a result" for petitioner (i.e., no gross-up of tax paid by donees of decedent's gifts), that this result is "plainly at variance with the policy of the legislation as a whole", and that "unequivocal evidence of the purpose of section 2035(c)" appears in H. Rept. 94-1380 (1976),[2] 1976-3 C .B. (Vol. 3) 735. (See pp. 772-774.)

*Plain conflict with the Congress' policy*

The majority conclude that the statutory language is "plainly at variance" with the congressional intent and profess to find "unequivocal evidence" of that intent. Shortly after the enactment of the Tax Reform Act of 1976, it became apparent that the legislation included many typographical and technical drafting errors. On April 28, 1977, Congressman Ullman, then Chairman of the Ways and Means Committee, introduced H.R. 6715, the Technical Corrections Act of 1977. Although this bill was passed by the House of Representatives as a separate piece of legislation, it was finally enacted as title VII of the Revenue Act of 1978—Technical Corrections of the Tax Reform Act of 1976. This title, encompassing 47 pages of the Statutes at Large (92 Stat. 2897-2944) consists of corrections of drafting errors. Fourteen of these 47 pages (92 Stat. 2925-2939) are devoted to corrections of errors in the estate and gift tax provisions of the Tax Reform Act of

---

[1] "[T]ax paid by the decedent or his estate."

[2] Sec. 2035(c) was enacted as part of H.R. 10612, the Tax Reform Act of 1976. The Ways and Means Committee report in question is the report on H.R. 14844, a bill which was not passed by either House and technically was not before the Conference Committee on the Tax Reform Act of 1976. The conferees on the Tax Reform Act of 1976 agreed to deal with the matters in H.R. 14844. In order to comply with the rules governing conference committees, the conferees reported the estate and gift part of the Tax Reform Act of 1976 as being in technical disagreement, and the conferees' language on this portion of their report was subjected to a separate vote on the floor of each House. The conferees explained (S. Rept. 94-1236, H. Rept. 94-1515 (Conf.), at 607 (1976), 1976-3 C.B. (Vol. 3) at 957) that "in those cases where the proposed amendment follows H.R. 14844, the conferees agree with and incorporate the explanation of those provisions contained in House Report 94-1380 (the Ways and Means Committee Report on H.R. 14844), *except as modified in this statement*." In the material headed "Gross-up for Gift Taxes", the conferees stated "*Conference agreement.*—The conference agreement follows H.R. 14844." S. Rept. 94-1236, H. Rept. 94-1515 (Conf.), at 608-609 (1976), 1976-3 C.B. (Vol. 3) at 958-959. The text of sec. 2035(c) that the conferees reported (and that was enacted) appears to be identical to that in H.R. 14844.

Accordingly, although the majority opinion and this dissenting opinion both rely on a report on a bill that was never passed and was not technically in conference, that report is properly a critical part of the legislative history of the Tax Reform Act of 1976—the statute that we must apply in the instant case.

1976. Remarkably, no one brought to the attention of the Congress the error that the majority conclude is plain, the error of which the majority find unequivocal evidence.

The Revenue Act of 1978, in its turn, generated the Technical Corrections Act of 1979, which was enacted as separate legislation (Pub. L. 96-222, 94 Stat. 194). Section 107 of the Technical Corrections Act of 1979 consists of amendments related to title VII of the Revenue Act of 1978—in other words, corrections of the 1978 Act's corrections of the 1976 Act. Once again, the Congress overlooked what the majority conclude is plainly a frustration of the Congress' purpose.

The Congress continued to reexamine section 2035. In addition to the amendments made by section 702(f)(1) of the Revenue Act of 1978 and section 107(a)(2)(F)(i) of the Technical Corrections Act of 1979, the Congress made significant revisions of section 2035 in the Economic Recovery Tax Act of 1981 (secs. 403(b)(3)(B) and 424(a)) and again reviewed the details of its work in the Technical Corrections Act of 1982 (sec. 104(d)).

Thus, the Congress amended section 2035 in four different statutes in the 6 years after enacting the provision we apply in the instant case. In two of these statutes, the Congress' avowed purpose was to be sure the words of the 1976 Act did not deviate from the policy of that act. In the 1981 Act, the Congress reexamined and revised the policy of the 1976 Act. Then, in the 1982 Act, the Congress "fly-specked" the 1981 Act's revision.

Now, more than 10 years later, the majority announce "unequivocal evidence" that the 1976 Act's language is "plainly at variance" with that act's policy.

I would conclude that the unequivocal evidence—the Congress' careful, almost contemporaneous, reexaminations of both the "literal language" and the policy of the 1976 Act, together with its actual amendments of subsections (b) and (d) of section 2035 and its failure to amend subsection (c) of section 2035—is that the literal language of section 2035(c) is not plainly at variance with the policy of the 1976 Act.

*Unequivocal evidence of the Congress' policy*

Before the amendments made by the Tax Reform Act of 1976, the gross estate was not increased by the amount of gift tax paid by the decedent. As the majority note (see p. 777), the Ways and Means Committee report (and the corresponding "Blue Book", 1976-3 C.B. (Vol. 2) 1, 539) state that this resulted in tax savings, which the Congress sought to eliminate. Accordingly, under the heading "Reasons for change", the Ways and Means Committee report states as follows, "To eliminate this tax avoidance technique, the committee believes that the gift tax paid on transfers made within 3 years of death should in all cases be included in the decedent's gross estate." H. Rept. 94-1380, at 12 (1976), 1976-3 C.B. (Vol. 3) at 746; Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, at 527 (1976), 1976-3 C.B. (Vol. 2) at 539.

However, after stating the "Reasons for change", the Ways and Means Committee proceeded to present a detailed "Explanation of provisions". As the majority note (see p. 778), the explanation provides a somewhat different view of the statute. The explanation does not state that "the gift tax paid should in *all cases* be included". (Emphasis added.) Rather, the explanation states that "The amount of gift tax subject to this rule would include *tax paid by the decedent or his estate* on any gift made by the decedent or his spouse after December 31, 1976. It would not, however, include any gift tax paid by the spouse on a gift made by the decedent within 3 years of death which is treated as made one-half by the spouse, since the spouse's payment of such tax would not reduce the decedent's estate at the time of death." (Emphasis added.) H. Rept. 94-1380, at 14 (1976), 1976-3 C. B. (Vol. 3) at 748; Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, at 529 (1976), 1976-3 C.B. (Vol. 2) at 541.

From this, we may conclude that, although the general policy ("Reasons for change") apparently would be served by the gross-up that the majority's opinion requires, it is not clear that the legislative articulation of the detailed

policy ("Explanation of provisions") is served by the gross-up.

It is not unusual for the Congress to determine a general policy, or focus on a specific problem, but then write its statute differently from its general policy or from what we would think is the intended legislative response to the specific problem. See, e.g., *Estate of Beal v. Commissioner*, 47 T.C. 269 (1966), and *Estate of Siegel v. Commissioner*, 74 T.C. 613 (1980). In each of these cases, we concluded from the legislative history that section 2039(a) was intended to deal with certain joint and survivor annuity matters, but that the statutory language varied from that intent. In each case we followed the statutory language (holding on the point in dispute for respondent in *Beal* and for petitioner in *Siegel*). In the instant case, for all we can tell from the legislative history, the Congress had a general intention but intended to deviate from that when it came time to focus on the specifics.

We cannot tell from the legislative history whether the differences between the "Reasons for change" and the "Explanation of provisions" were intended or accidental. Under these circumstances, I respectfully suggest that we do not have such "unequivocal evidence" of intent as to justify departing from what the majority concede to be the meaning of the statute's language.

*When the policy should control*

The majority state (see p. 773) that "we may go beyond the literal language of the Code if reliance on that language would defeat the plain purpose of Congress." For this proposition, they rely primarily on an opinion of the Supreme Court—*Bob Jones University v. United States*, 461 U.S. 574(1983). In that case, the Supreme Court held that two educational institutions were not exempt under section 501(c)(3) (or the subtitle C equivalents of sec. 501(c)(3)) even though they met the requirements of the statutory language. In applying its canon of statutory construction, the Supreme Court focused on the purposes of the charitable exemptions and charitable contributions provisions of the Code and concluded that a literal application of these provisions would frustrate "a firm national policy to pro-

hibit racial segregation and discrimination in public education." 461 U.S. at 593. The Supreme Court concluded that "Over the past quarter of a century, every pronouncement of this Court and myriad Acts of Congress and Executive Orders attest" this policy. 461 U.S. at 593. The Supreme Court majority pointed out that a literal application of the statute, as the dissenters proposed, would lead to tax-exempt status for "Fagin's school for educating English boys in the art of picking pockets" as well as for "a school for intensive training of subversives for guerrilla warfare and terrorism". 461 U.S. at 591 n. 18.

I, for one, cannot discern in the facts and law of the instant case, the "firm national policy" that would be so outrageously violated if we followed what the majority agree is the effect of the language of the controlling statute.

Rather, I would follow the advice of the Court of Appeals for the Ninth Circuit in *Feldman v. Commissioner*, 791 F.2d 781 (9th Cir. 1986), affg. 84 T.C. 1 (1985). In a Court-reviewed opinion, we held that the literal language of section 280A(c)(3) permitted the taxpayers to deduct certain expenses related to a portion of their home that was rented to the taxpayer-husband's employer. The Court of Appeals affirmed, concluding its opinion as follows (791 F.2d at 784):

> Under these circumstances, the literal interpretation urged by the taxpayer and approved by the Tax Court should be followed. See *Tulalip Tribes*, 732 F.2d at 1454-55. Unlike some other kinds of legislation, tax laws are not enacted for the ages, but for the special exigencies of a particular time and discrete circumstances. Change in the tax law is a way of life. Thus, we are confident that Congress can respond with prompt legislation should it believe we misunderstood its commands.[3]

## II. *Deduction of Income Tax*

Petitioner paid decedent's additional income tax that resulted from a net gift, in accordance with *Diedrich v. Commissioner*, 457 U.S. 191 (1982). The Congress overruled *Diedrich* as to transfers made before the Court of Appeals'

---

[3] In sec. 143(b) of the Tax Reform Act of 1986, 100 Stat. 2120, the Congress amended sec. 280A(c) to prohibit the deduction that had been allowed in *Feldman v. Commissioner*, 791 F.2d 781 (9th Cir. 1986), affg. 84 T.C. 1 (1985). Thus, the Court of Appeals' estimate of the situation was correct. The Court of Appeals and this Court heeded the Congress' statute. The Congress then set the law aright by correcting its statute. Implicitly, the Congress acknowledged the wisdom of our course of action, by making its change prospective only. Sec. 151(a), Tax Reform Act of 1986, 100 Stat. 2121.

ruling in that case. In so doing, the Congress explained its action as follows:

### Reasons for Change

Prior to the *Diedrich* decision, several courts had ruled that the transfer of property subject to the transferee paying any gift tax did not result in any gain realized by the transferor. While Congress believed that the *Diedrich* decision is correct, it also believed that taxpayers should not be affected adversely because they may have made such transfers in reliance upon what was thought to be established law that no income tax liabilities would accrue from such transfers. [Staff of Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 1126.[4] Fn. ref. omitted.]

The majority engage in an analysis of court-made law relating to when post-death events may be taken into account for estate tax purposes. That discourse is instructive and in other circumstances might well be determinative. However, as the majority implicitly concede, the text of the statute does not clearly compel the specific result they reach. Under these circumstances, we should consult the legislative history to determine what was intended. E.g., *Blum v. Stenson*, 465 U.S. 886, 896 (1984).

In the 1984 Act, the Congress provided a benefit, by giving back a tax that had properly been imposed and paid. The Congress "believed that taxpayers should not be affected adversely" by their reliance on prior understanding of the law.

The majority take the Congress' "hold-harmless" legislation and convert it into a windfall. Petitioner not only gets back the tax it paid but also gets the benefit of deducting the refunded tax. Under the majority's analysis, petitioner is better off than it would have been if *Diedrich* had been decided the other way. Nothing in the legislative history indicates an intention to provide such a double benefit.

The statute does not compel such a double benefit. The legislative history does not show an intent to provide such a double benefit. We should not gratuitously provide the double benefit. *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969); *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934).

---

[4]To the same effect, see H. Rept. 98-432 (Part 2) at 1707 (1984); and H. Rept. 98-861, at 1241-1242 (Conf. 1984), 1984-3 C.B. (Vol. 2) 1, 495-496.

On the inclusion issue, I would hold for petitioner that the statute provides the answer—no gross-up since the gift tax was not paid by decedent or petitioner. The statute should control over the Congress' unclear intent.

On the deduction issue, I would hold for respondent that the Congress' intent provides the answer—the refund mandated by the Deficit Reduction Act of 1984 was not intended to put taxpayers into a better position than they would have been if *Diedrich* had been decided for the taxpayer.

On these two issues, respectfully, I dissent.

WHITAKER, KÖRNER, and PARR, *JJ.*, agree with this concurring and dissenting opinion.